# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-01-00156-CV

**Lakeshore Utility Company, Inc., Sentry Title Company, Inc., Alan D. Whatley, and Thelma J. Whatley, Appellants**

**v.**

**Texas Natural Resource Conservation Commission, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT NO. 481,027, HONORABLE PAUL DAVIS, JUDGE PRESIDING

Appellants Lakeshore Utility Company, Inc., Sentry Title Company, Inc., Alan D. Whatley, and Thelma J. Whatley (together ALakeshore@)[1] appeal a district-court judgment in favor of the Texas Natural Resource Conservation Commission (the ACommission@).[2] The judgment imposed civil penalties for

---

[1] Sentry Title Company, Inc. is the parent of Lakeshore Utility Company, Inc. and owns the physical plant and facilities used by Lakeshore. Alan Whatley is the president and a director of both Sentry and Lakeshore. The record reflects that from time to time he has represented himself to the Commission as Lakeshore=s Ageneral manager.@ Thelma Whatley is the vice-president of both Sentry and Lakeshore. As Aaffiliated interests,@ Sentry and the Whatleys are subject to the jurisdiction of the Commission. *See* Tex. Water Code Ann. ' 13.341 (West 2000). We will generally refer to these parties collectively, as their interests in this appeal do not diverge.

[2] Because of the lengthy history of this case, we will at times refer to actions taken by the Public Utility Commission and the Texas Water Commission, both predecessors to the Texas Natural Resource Conservation Commission in the regulation of wastewater services. For convenience we will refer to all regulatory bodies as the ACommission.@

knowing violations of chapter 13 of the Texas Water Code[3] and ordered Lakeshore to refund unauthorized charges to its customers.[4] Lakeshore appeals by three issues. We will affirm in part and reverse and remand in part the judgment of the district court.

---

[3] *See* Tex. Water Code Ann. §§ 13.135, .190 (West 2000). Chapter 13 was added to the water code in 1985. *See* Act of May 26, 1985, 69th Leg., R.S., ch. 795, § 3.005, 1985 Tex. Gen. Laws 2789, 2789-804. The predecessor statute is found in the revised statutes, art. 1446(c), § 46, *repealed by* Act of March 29, 1995, 74th Leg., R.S., ch. 9, § 2(a), 1995 Tex. Gen. Laws 87. In 1989 then section 13.414(a) of the code provided that "any retail public utility or affiliated interest that *knowingly* violates this chapter . . . is subject to a civil penalty." Act of May 29, 1989, 71st Leg., R.S., ch. 567, § 38, 1989 Tex. Gen. Laws 1896 (emphasis added). The act was amended in 1991 to remove "knowingly" from the provision and to reduce the amount of the penalty per violation. *See* Act of May 27, 1991, 72d Leg., R.S., ch. 678, § 14, 1991 Tex. Gen. Laws 2463.

[4] *See* Act of May 29, 1989, 71st Leg., R.S., ch. 567, § 38, 1989 Tex. Gen. Laws 1896 (amended 1991, 1993, 1995 & 2001) (current version at Tex. Water Code Ann. § 13.187(i) (West Supp. 2002)). The 2001 amendments, *inter alia*, renumbered former section 13.187(c) as section 13.187(i). The current provision does not differ materially from the former, in effect at the time of the district-court trial. *Compare* Act of June 1, 1987, 70th Leg., R.S., ch. 539, § 11, 1987 Tex. Gen. Laws 2163, 2164, *with* Tex. Water Code Ann. § 13.187(i). We will cite the current provision for convenience.

# BACKGROUND

This dispute revolves around Atap fees@Cthe fees charged for installation of water and sewer serviceCthat Lakeshore charged in excess of such fees listed on its approved tariff, or schedule of rates, on file with the Commission. Lakeshore is a water and sewer utility that provides service to two residential subdivisions in Henderson County, Point La Vista and Esquire Estates II.[5] Both are located adjacent to Cedar Creek Lake. Because of the proximity to the lake and the elevation of the lots, a typical gravity- or gradient-flow sewer system cannot be used. Instead a more complex and expensive Apressure-effluent system@ is used to pump wastewater from holding tanks on each lot to the sewer mains.

In 1977 the Commission accepted Lakeshore=s tariff that set fees for water Atap and meter installation@ at $200 and sewer Atap and meter installation charge@ at a maximum of $600. Lakeshore filed with the Commission, on September 24, 1981, a ANotice of Proposed Rate Change,@ and, on February 2, 1982, a ARate/Tariff Change Application,@ seeking, *inter alia*, to increase its tap fees for water service to $375 and sewer service to $1150. On January 21, 1983, the Commission denied the applications and ordered Lakeshore to Acharge the rates set out on Exhibit 1 of the Examiner=s Report in this docket.@ Exhibit 1 allowed Lakeshore to recover Aactual cost, not to exceed $200.00@ for water ATap and Meter installation@ and Aactual cost, not to exceed $600.00@ for sewer ATap and initial installation.@ The Commission thus allowed roughly the same charges reflected in Lakeshore=s 1977 tariff, the only difference

---

[5] The record sometimes refers to the subdivisions as APoint LaVista@ and AEsquire Estates #2.@ We will refer to them as in the district court=s final judgment.

3

being that, under the tariff, Lakeshore could apparently charge a flat fee, while the 1983 order restricted Lakeshore to passing through its actual cost, up to a ceiling of $200 and $600, respectively. In 1986 Lakeshore filed a ANotice of Proposed Rate Change@ for Point La Vista only, setting tap fees of $250 for water and $550 for sewer. By order of January 14, 1987, the Commission approved the changes with the proviso that both tap fees were Alimited to the average of [Lakeshore]=s actual costs for materials and labor for standard residential connections.@

On January 23, 1989, Lakeshore applied to the Commission to increase tap fees in both Point La Vista and Esquire Estates II to $375 for water and $1350 for sewer.[6] While awaiting the outcome of its rate-change application, Lakeshore charged the proposed fees on an interim basis. On December 21, 1989, the Commission, basing its decision on its finding that ALakeshore did not provide notice to customers of a request to raise water and sewer tap fees@ as required by the water code, rendered an order denying Lakeshore=s application and ordering Lakeshore to refund the disallowed charges collected during the pendency of Lakeshore=s application by crediting them to future customer bills. *See* Tex. Water Code Ann. ' 13.187(i) (West Supp. 2002).

In separate actions, Lakeshore sought judicial review of the 1989 order, *see* Tex. Gov=t Code Ann. ' 2001.171 (West 2000), and the Commission sought to enforce the order, *see* Tex. Water Code Ann. ' 13.411(a) (West 2000). In its enforcement action, the Commission alleged that Lakeshore had knowingly violated the 1989 order and sought to enjoin Lakeshore from future violations and to comply

---

[6] Lakeshore=s application requested other changes in charges for utility services not germane to this Court=s consideration of Lakeshore=s appeal.

with the order. The Commission also sought civil penalties against Lakeshore Afor each day Lakeshore . . .

has been in violation of the Water Code and the Commission=s order since December 21, 1989.@ In a

single judgment, the district court reversed the Commission=s order and dismissed its enforcement action.

*See Texas Water Comm=n v. Lakeshore Util. Co.*, No. 03-93-416-CV (Tex. App.CAustin May 18,

1994, writ denied) (not designated for publication). The Commission appealed. This Court reversed the

district court and affirmed the 1989 order. *Texas Water Comm=n v. Lakeshore Util. Co.*, 877 S.W.2d

814 (Tex. App.CAustin 1994, writ denied). In a separate opinion, we remanded the enforcement action to

the district court. *Lakeshore Util. Co.*, No. 03-93-00416-CV (May 18, 1994).

After remand to the district court, the Commission amended its pleadings to include Sentry

and the Whatleys as defendants and, for the first time, sought refunds beyond the scope of the 1989 order:

> [Lakeshore] should be enjoined to refund tap fees, charges for the initiation of water and
> sewer service, in excess of the fees authorized by the Order of the Commission. Any
> amounts in excess of authorized fees charged since 1981 to the present shall be refunded
> by Lakeshore to the customer, plus interest at the legal rate.

The genesis of this action, in its current form, was probably in August 1982, when Alan

Whatley, while testifying on behalf of Lakeshore in a Commission hearing concerning sewer service to a

neighboring subdivision, stated that Lakeshore was charging its customers tap fees in excess of those listed

on its 1977 tariff. The Commission ordered its general counsel to Afile an inquiry to look into the rates that

have been and are being charged by Lakeshore.@ The December 21, 1989 order commanded Lakeshore

to turn over a Acomplete accounting of all fees paid by people for the establishment of new water and/or

sewer utility service from December 8, 1981 . . . until the date of this Order.@ Upon reviewing Lakeshore=s

5

records, the Commission discovered that Lakeshore had been charging $375 for water taps and $1150 for sewer taps since applying for the rate increase in 1981, even though that application was denied.

In a bifurcated trial, the district court first determined Lakeshore=s liability and rendered an interlocutory judgment affirming the 1989 order, forbidding Lakeshore to charge fees in excess of those approved, and finding that Lakeshore had violated the water code. In a subsequent proceeding, the court determined the number of violations and amount of penalties. The court rendered final judgment against Lakeshore, ordering refunds of $106,417.66, $68,851.43 in prejudgment interest, civil penalties in the amount of $126,400, attorney=s fees, and court costs . The district court also filed findings of fact and conclusions of law.

Lakeshore appeals only the parts of the judgment that order it (1) to pay civil penalties for *knowingly* charging unauthorized water and sewer tap fees and (2) to refund unauthorized charges to its customers beyond the scope of the 1989 order. By three issues, Lakeshore argues that the district court erred by (1) finding that Lakeshore committed knowing violations of the water code, because there was no evidence that Lakeshore knowingly violated the code; (2) finding that Lakeshore committed knowing violations, because the evidence is so weak that the findings are clearly wrong and manifestly unjust; and, (3) ordering Lakeshore to refund the unauthorized charges to customers, because the Commission does not have the authority to seek such relief.

**KNOWING VIOLATIONS**

*Standard of Review*

6

Lakeshore contends, by its first two issues, that there is no evidence to support the district court=s findings of knowing violations of sections 13.135 and 13.190 of the water code before December 21, 1989, or that the evidence supporting the court=s findings is so weak that the findings are clearly wrong and manifestly unjust. *See* Tex. Water Code Ann. ' ' 13.135, .190 (West 2000). We attach to findings of fact the same weight that we attach to a jury=s verdict upon jury questions. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). Findings of fact are reviewed for legal and factual sufficiency of the evidence by the same standards used to review jury findings. *Westech Eng=g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 195 (Tex. App.CAustin 1992, no writ). We review challenges to conclusions of law *de novo* as legal questions, examining the legal conclusions drawn from the facts to determine their correctness. *See Circle C Child Dev. Ctr., Inc. v. Travis Cent. Appraisal Dist.*, 981 S.W.2d 483, 485 (Tex. App.CAustin 1998, no pet.). The trial court=s conclusions will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *See Westech Eng=g*, 835 S.W.2d at 196; *Simpson v. Simpson*, 727 S.W.2d 662, 664 (Tex. App.CDallas 1987, no writ).

In reviewing the evidence under a Ano evidence@ point of error, we consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party=s favor. *Olin Corp. v. Smith*, 990 S.W.2d 789 (Tex. App.CAustin 1999, pet. denied) (citing *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285-86 (Tex. 1998); *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). We will uphold the finding if there is more than a scintilla of evidence to support the finding. *Catalina*, 881 S.W.2d at 297. The evidence supporting a finding amounts

7

to more than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular case. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995).

In conducting a factual-sufficiency review, we consider and weigh all of the evidence and set aside the judgment only if it is factually so weak or so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986 ); *In re King=s Estate*, 244 S.W.2d 660, 661 (Tex. 1951). When challenging the factual sufficiency of the evidence supporting an adverse finding upon which it did not carry the burden of proof, an appellant must demonstrate that there is insufficient evidence to support the adverse finding. *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 275-76 (Tex. App.CAmarillo 1988, writ denied). We will consider and weigh all the evidence in support of and contrary to the finding. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We will not substitute our judgment for that of the trier of fact merely because we would reach a different conclusion. *Otis Elevator Co. v. Joseph*, 749 S.W.2d 920, 923 (Tex. App.CHouston [1st Dist.] 1988, no writ).

*Analysis*

Section 13.135 of the water code provides that Aa utility may not charge, collect, or receive any rate for utility service or impose any rule or regulation other than as provided in this chapter.@ Tex. Water Code Ann. ' 13.135. Section 13.190 provides:

A water and sewer utility may not directly or indirectly by any device or in any manner charge, demand, collect, or receive from any person a greater or lesser compensation for any service rendered or to be rendered by the utility than that prescribed in the schedule of

8

rates of the utility applicable to that service when filed in the manner provided in this chapter.

*Id.* ' 13.190.  The version of section 13.414 in effect at the time this action accrued authorized civil penalties ranging from $1000 to $5000 per day for Aknowing@ violations of the code.  *See* Act of May 29, 1989, 71st Leg., R.S., ch. 567, ' 38, 1989 Tex. Gen. Laws 1896 (amended 1991).  The water code does not define Aknowing,@ and the term, as used in the code, has not been addressed by the courts.  Therefore, we draw from other areas of the law to determine the appropriate standard to apply here.  The penal code provides that a person acts Aknowingly,@ Awhen he is aware of the nature of his conduct or that the circumstances surrounding his conduct exist.@ Tex. Pen. Code Ann. ' 6.03(b) (West 1994).  The business and commerce code defines Aknowingly@ as Aactual awareness, at the time of the act or practice complained of, of the falsity, deception, or unfairness of the act or practice.@ Tex. Bus. & Com. Code Ann. ' 17.45(9) (West Supp. 2002).  The supreme court has held that Aactual awareness@ means that a person knows his actions are Afalse, deceptive, or unfair.@ *St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.*, 974 S.W.2d 51, 53-54 (Tex. 1998).

Lakeshore=s argument is, in essence, that it did not know that it was violating the water code because the Commission had no rules defining Atap fee@ until 1987[7] and that it cannot be held to have had

---

[7] In 1987 the Commission, for the first time, defined Atap fee:@

[a] tap fee is the charge to new customers for initiation of service where no service previously existed.  A tap fee may include the cost of physically tapping the main and installing meters, meter boxes, fittings, and other materials, labor, setting up the new customer=s account, and allowances for equipment and tools used.

knowledge of rules which did not exist during the relevant violation period. Additionally, Lakeshore points to an emergency rule adopted by the Commission in 1986, which provided that an individual residential customer could be charged the Afull cost of extending service to and throughout their property, including the cost of all necessary transmission and storage facilities@ if the customer placed Aunique, *nonstandard* service demands upon the systems.@ 11 Tex. Reg. 1266 (1986) (proposed March 14, 1986) (emphasis added). The Commission failed to define Anonstandard service@in its rule, and Lakeshore contends that it construed nonstandard service to include the additional costs of the pressure-effluent system used throughout both subdivisions.

The Commission argues that Lakeshore=s knowledge of the definition of tap fee is irrelevant to Lakeshore=s knowledge that it was charging customers rates not approved by the Commission. We agree. The critical question is whether Lakeshore knowingly charged rates other than those that the Commission had approved and Lakeshore had listed on its tariff. *See* Tex. Water Code Ann. '' 13.135, .190; Act of May 29, 1989, 71st Leg., R.S., ch. 567, ' 38, 1989 Tex. Gen. Laws 1896 (amended 1991). Lakeshore=s 1977 tariff listed sewer ATap and Installation@ fee for Aregular pressure@ at $450 and for Alocations requiring heavy-duty pump or excessive lift@ at $600. It listed its water ATap and Meter Installation@ fee at $200. Clearly, these charges included the cost of pumps and meters. In its September 1981 ANotice of Proposed Rate Change,@Lakeshore proposed an increase in the water Atap [and] meter installation@ to $375. It also proposed an increase in sewer Atap [and] initial installation@ to $1150 and

12 Tex. Reg. 3120-3121 (1987) (proposed September 11, 1987).

noted parenthetically that the rate would include Apump, tanks, valves, fittings, [and] controls.@ Both the approved and proposed rates included the cost of equipment. Lakeshore did not request a change in its tariff to reflect a separate charge for the cost of equipment. Lakeshore charged its customers the higher rates while the Commission was considering its proposal.

Ultimately, the Commission denied Lakeshore=s application on January 21, 1983, and ordered Lakeshore to resume charging the rates listed on its original 1977 tariffCa water tap fee of $200 and a sewer tap fee of $600. Lakeshore, however, continued to charge its customers the higher rates, which the Commission had failed to approve. Lakeshore argues that it was justified in this course of action because it was still charging the tap fee as approved in its 1977 tariff, but with additional charges for the cost of equipment. In defense of Lakeshore=s charging rates greater than reflected in its tariff, Alan Whatley testified that he had relied on conversations with Commission employees. But additional charges, even those that might be reasonable and necessary due to special equipment, must be listed on a tariff on file with the Commission. That Whatley knew of this requirement is evident from his testimony at trial:

Q:          Okay. Now, did the issue of tap fees come up again when you put a 1986
            rate application in that resulted in the 1987 Order?

A [by Alan
   Whatley]: Yes, sir.

Q:          What discussion did you have in connection with that rate application
            concerning these tap fees?

A:          Along the same lines we had had earlier, six years before, five years before.
            And that had just came [sic] over from the PUC into the Texas Water
            Commission. And these people that were in there, I think they had some of
            the people that came over with the group that came from PUC. But they
            were all, the engineer at the time agreed with me that the tap fee should be

11

> separate and apart from the sewer installation and that=s the way it should be reflected in the tariff.

> Q: Okay. Did you let that engineer know you were charging the $600 on top of the tap fee?

> A: Oh, yes, yes. They felt that was **B** there was some discussion back and forth of whether that was even considered part of the system or not.

More telling is Whatley=s 1982 testimony, which led the Commission to order an inquiry by its general counsel into Lakeshore=s tap-fee charges:

> Q: And in Point La Vista Subdivision, are those**B**what is the current tap on rate over there?

> A [by Alan
>   Whatley]: I think it=s $550. Water is 250 and**B**or 200 and**B**the two of them together is in the neighborhood of $800.

> Q: Could you explain to me why someone over there, a customer, would say that they had been charged, one $700 for a tap on, and another, $1,400.

> A: I couldn=t explain to you why they=d say that at all. I=d say this, that our present tap on fee for that would be $1,150, and I forget what the water is. The two of them together could possibly come to 1,400 or better. Around 1,500, as I recall, the two of them together.

> Q: Oh, you=re saying the current tap on is $1,150?

> A: That=s exactly right.

> Q: I was under the impression that the PUC had the rate set at**B**not the**B**fee at $600 for tap on.

> A: That=s correct.

The Commission=s 1983 order set the tap fees at what was listed in the 1977 tariff. The 1987 order confirmed what was approved on the tariff. Whatley testified that Lakeshore was charging a fee other than that approved by the Commission. It is evident that Lakeshore was fully aware that the Commission had accepted and approved a tariff that did not include separate charges for equipment. We hold that there is ample evidence in the record to support the district court=s finding that Lakeshore committed knowing violations of the water code by charging tap fees in excess of those listed on its tariff, and we overrule issues one and two.

## REFUNDS

### *Standard of Review*

By its third issue, Lakeshore argues that the district court erred in ordering Lakeshore to refund overcharges to customers because the Commission lacked statutory authority to seek such relief. Statutory construction is a question of law, which we review *de novo. Lopez v. Texas Workers=Comp. Ins. Fund*, 11 S.W.3d 490, 494 (Tex. App.CAustin 2000, pet. denied) (citing *Johnson v. City of Fort Worth*, 774 S.W.2d 653, 656 (Tex. 1989); *Republic W. Ins. Co. v. State*, 985 S.W.2d 698, 701 (Tex. App.CAustin 1999, pet. dism=d w.o.j.)).

### *Analysis*

Lakeshore does not dispute the refunds it owes its customers for the higher rates that were charged during the pendency of the 1989 rate application. Those refunds were ordered by the Commission in its 1989 order and, as Lakeshore concedes, are plainly authorized by the water code: A[T]he utility shall

13

refund or credit against future bills all sums collected during the pendency of the rate proceeding in excess of the rate finally ordered plus interest as determined by the regulatory authority.@ Tex. Water Code Ann. ' 13.187(i). Lakeshore disputes the district court=s judgment requiring refunds for overcharges *before* the 1989 proceeding.

Section 13.411 of the water code authorizes injunctions to prohibit violations or to require compliance with the water code or a Commission rule or order:

> If the commission has reason to believe that any retail public utility . . . is engaged in or is about to engage in any act in violation of this chapter or of any order or rule of the commission . . . the attorney general on request of the commission . . . shall bring an action in a court of competent jurisdiction . . . *to enjoin the commencement or continuation of any act or to require compliance with this chapter or the rule or order.*

Tex. Water Code Ann. ' 13.411(a) (emphasis added). Lakeshore contends that the code does not authorize retroactive relief. We resolve questions of statutory construction by first looking to the statute=s words. *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 484 (Tex. 1998). Section 13.411(a) is unambiguous and its plain language provides that the attorney general may seek to (1) enjoin present or future violations, and (2) compel compliance with the statute or the Commission=s rules or orders. Because the unauthorized charges that Lakeshore refuses to refund were made before 1989 and thus do not constitute present or future violations, we direct our attention to that part of the water code authorizing actions to require compliance with the code or a rule or order of the Commission.

The Commission=s 1983 order compelled Lakeshore Ato refund to its customers all monies collected in excess of the rates set forth [in its 1977 tariff]. Failure to comply with this Order will result in

14

referral to the Attorney General=s office for further prosecution.@ The Commission=s 1989 order only mandated refunds of the excess amounts charged while the rate application was pending:

> BE IT ORDERED . . . THAT . . . Lakeshore provide a pro rata credit to customers= bills equal to the difference between the rates charged pursuant to the March 1, 1989 increase and the rates as set herein, in nine consecutive equal monthly installments beginning with the billing cycle immediately following the date of this Order.

Both orders were rendered in response to actions originated by Lakeshore. The record is silent regarding the Ainquiry,@ if any, conducted by the Commission=s general counsel in response to the Commission=s 1982 order. In 1985 and 1987, the Commission rendered orders concerning rate increases sought by Lakeshore. Neither order addresses earlier unauthorized charges. The record contains no post-1989 Commission order directing Lakeshore to refund unauthorized charges disclosed by the records Lakeshore provided the Commission in response to the Commission=s 1989 order. A careful review of the record before us has uncovered no Commission order addressing Lakeshore=s history of unauthorized charges, in spite of the fact that Lakeshore has almost continuously ignored Commission rate orders since at least 1981, and the Commission has been aware of Lakeshore=s unauthorized charges since 1982.

We recognize that by 1997 it was more convenient for the Commission to seek to recover all of Lakeshore=s unauthorized charges in the pending enforcement action, but A[a]n agency may exercise only those specific powers that the legislature confers upon it in clear and express language.@ *Sportscoach Corp. of Am. v. Eastex Camper Sales, Inc.*, 31 S.W.3d 730, 734 (Tex. App.CAustin 2000, no pet.) (citing *Kawasaki Motors Corp. U.S.A. v. Texas Motor Vehicle Comm=n*, 855 S.W.2d 792, 797 (Tex. App.CAustin 1993, no writ)). An agency may not erect and exercise a new or additional power, or a

15

power that contradicts a statute, from a specific power, function, or duty expressly delegated by that statute. *American Honda Motor Co. v. Texas Dep=t of Transp.BMotor Vehicle Div.*, 47 S.W.3d 614, 624 (Tex. App.CAustin 2001, pet. denied) (citing *Sexton v. Mount Olivet Cemetery Ass=n*, 720 S.W.2d 129, 137-38 (Tex. App.CAustin 1986, writ ref=d n.r.e.)). Likewise, an agency may not exercise a new power Asolely for the administrative purposes of expediency.@ *Id.* at 624 (citing *Sexton*, 720 S.W.2d at 138).

Certainly, the Commission has broad power to regulate and supervise the business of water and sewer utilities. *See* Tex. Water Code Ann. ' 13.041(a) (West 2000). Indeed, at the Commission=s request, the attorney general Ashall bring suit for the appointment of a receiver to collect the assets and carry on the business of a water or sewer utility that . . . violates a final order of the [C]ommission.@ *Id.* ' 13.412(a)(3). And the attorney general Ashall institute suit on his own initiative or at the request of, in the name of, and on behalf of the [C]ommission@ for *penalties*. *Id.* ' 13.414(c). The water code, however, does not contain similar authorization to seek *refunds*. At most the code gives the Commission, through the attorney general, the authority to seek a district-court judgment enforcing a Commission order commanding refunds. *See id.* ' 13.411(a).

The Commission further argues that the doctrine of *parens patriae* gives it standing to seek refunds for customers in addition to its broad authority to seek penalties. The Commission asserts that this case presents Aan actual controversy between the Commission and Lakeshore, whose resolution, if the well-being of the public is to be preserved, should include not just a civil penalty but also a refund order with respect to the amounts overcharged.@ In Texas, the doctrine has been used sparingly. Under the doctrine, the State, as Aparent of the country,@ may sue to protect an Ainterest in the health and well-beingCboth

16

physical and economicⒸof its residents in general.@  *Bachynsky v. State*, 747 S.W.2d 868, 869 (Tex.

App.ⒸDallas 1988, writ denied) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592,

607 (1982)).  Although the Commission construes water code section 13.411 to allow it to seek a

mandatory injunction to compel Lakeshore to refund unauthorized charges, the Commission is actually

seeking damages on behalf of Lakeshore=s customers.  A*Parens patriae* actions for damages have been

allowed in only a few cases involving claims for pollution cleanup and destruction of natural resources, and

occasionally small overcharges against the entire populace of the state and restitution for consumer fraud.@

*Id.* at 870 (footnotes omitted).  We decline to extend the doctrine to the circumstances presented by this

case.

Although we do not condone Lakeshore=s actions, we will not infer that either the

Commission or the attorney general has the power to initiate a court action to recover unauthorized charges

on behalf of a utility=s customers.  We hold that, in the absence of a Commission order directed to a utility to

refund or credit unauthorized charges, the water code does not, by clear and express language, grant the

Commission the right to bring an action in court to recover those charges for the benefit of the utility=s

customers.

To the extent that the  district-court judgment orders refunds beyond those specifically

provided in the Commission=s January 21, 1983 and December 21, 1989 orders, we sustain Lakeshore=s

issue.

## CONCLUSION

We reverse the portion of the district court=s judgment ordering Lakeshore to refund unauthorized charges other than those specifically provided in the Commission=s January 21, 1983 and December 21, 1989 orders. In all other respects, we affirm the judgment. We remand this cause to the district court for further proceedings not inconsistent with this opinion.


Lee Yeakel, Justice

Before Justices Kidd, Yeakel and Patterson

Affirmed in Part; Reversed and Remanded in Part

Filed: September 12, 2002

Publish