# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00611-CV

**Texas Building Owners and Managers Association, Inc.; Building Owners and Managers Association International; Tanglewood Property Management Company; Emissary Group; 5599 San Felipe, Ltd., and the Real Access Alliance, Appellants**

**v.**

**The Public Utility Commission of Texas and the State of Texas, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
## NO. GN200146, HONORABLE DARLENE BYRNE, JUDGE PRESIDING

## O P I N I O N

This case concerns the scope of the Public Utility Commission's power to enforce the Building Access Statutes (the "Statutes") of the Public Utility Regulatory Act (PURA). *See generally* Tex. Util. Code Ann. §§ 54.259-.261 (West 1998). The Statutes require a public or private property owner to give a telecommunications utility access to the property for the purposes of installing a service facility at a tenant's request. Appellants, consisting of property management organizations and trade groups (collectively, "the Building Owners"), sued the Commission in district court, seeking both a declaratory judgment that the Statutes are unconstitutional on their face and a permanent injunction to enjoin the Commission from enforcing the Statutes by way of the

Commission's promulgated rules.  *See* 16 Tex. Admin. Code § 26.129 (2003).  The district court

declared the Statutes facially constitutional and denied the Building Owners' requests for injunctive

relief.  On appeal, the Building Owners contend in three issues that the district court erred because:

(1) the Statutes cause a taking of their property without providing an adequate procedure for

determining compensation; (2) the Commission lacks the delegated power to determine

compensation; and (3) even if the Commission has that power, it results from an unconstitutional

delegation.  We will affirm the judgment of the district court.

## BACKGROUND

*The Building Access Statutes*

To understand the context in which this particular dispute has arisen, we must begin

with an overview of the history of telecommunications regulation in Texas.  Under traditional

regulatory structures for telephone service, one telecommunications company would hold the

exclusive right to provide customers within specific geographic regions of the state with basic local

telephone service.[1]  In 1983, the Texas Legislature began to reform the traditional regulatory

structure by amending PURA.  *See* Act of May 26, 1983, 68th Leg., R.S., ch. 274, § 18, 1983 Tex.

Gen. Laws 1282 (codified at Tex. Util. Code Ann. § 52.001 (West 1998)).  At that time, the

---

[1] Many of these companies still provide telecommunications service in Texas and are now referred to in the industry as "incumbent local exchange carriers" or "ILECs."  An example of an ILEC is SBC Communications, formerly known as Southwestern Bell.

2

legislature set as a policy goal that rules, policies, and principles of telecommunications regulation be geared towards providing "equal opportunity to each telecommunications utility in a competitive marketplace." *Id*. (codified at Tex. Util. Code Ann. § 52.011(b)(2) (West 1998)). In 1995, Texas continued its reform of the regulatory structure by permitting basic local telephone service competition. It became the policy of Texas to promote diversity of telecommunications providers, encourage competition in the telecommunications marketplace, and maintain wide availability of high quality, affordable services. *See* Act of May 12, 1995, 74th Leg., R.S., ch. 231, § 7, 1995 Tex. Gen. Laws 2018 (codified at Tex. Util. Code Ann. § 51.001(b) (West Supp. 2003)). This policy of modernizing telecommunications regulation is to be achieved by legislation that both guarantees the affordability of basic telephone service in a competitively neutral manner and fosters free market competition in the telecommunications industry. *See id*. (codified at Tex. Util. Code Ann. § 51.001(c)(1)-(2) (West Supp. 2003)).

On the federal level, Congress has enacted the federal Telecommunications Act of 1996 ("the Act"), Pub. L. No. 104-104, 110 Stat. 56 (codified in scattered sections of 15 and 47 U.S.C.), which opened local markets to competition nationwide. The Act created a new type of provider ("competitive local exchange carriers" or "CLECs"), defined the rights and obligations of these new carriers and of the ILECs, and eliminated barriers to competitive entry into markets. In addition, the Act continued the tradition in telecommunications law of shared state-federal jurisdiction. *See AT&T Corp. v. Iowa Util. Bd.*, 525 U.S. 366 (1999). Under this form of telecommunications regulation, CLECs are permitted to choose to provide services to customers in one of two ways. CLECs can choose to buy the services of other providers at wholesale rates and

3

then resell them at retail to end-user customers, or they can acquire and install their own equipment so as to limit or eliminate reliance on the networks of other providers.

When only ILECs provided local telephone service, owners of office buildings and other multi-tenant properties typically allowed these telephone companies to install wiring and equipment in their buildings according to that provider's procedures.[2] Business needs required only regular dial telephone service, and, even when a business needed multiple lines, providing service was relatively uncomplicated. Today, the need to exchange vast amounts of data and information means that high-speed, large-capacity data circuits and internet access have become essential elements of operating a business. As a result, businesses approach the issue of choosing a telecommunications provider by considering a radically new set of factors: previously installed ILEC hardware may not offer the high-capacity service needed; hardware may not include fiber optic cabling necessary to support advanced services; a CLEC may offer lower prices or different packages of services; or a business may require redundant facilities from two different providers because of the need for uninterrupted service and network security.

From the perspective of a telecommunications provider, an office building presents a dense customer base that can be efficiently served using a discrete set of facilities. In addition, when a CLEC is able to establish service to a multi-tenant property, that CLEC may then be able to

---

[2] As a result, most multi-tenant buildings have ILEC hardware installed. But an ILEC may be denied access to a newly constructed building.

invest in equipment so as to make provision of their services economical to customers in a geographic area much larger than the building itself. The Statutes were thus enacted to ensure that tenants have the same right to choose their provider of telecommunications services as other residential and business customers by prohibiting a property owner from discriminating between service providers or from preventing a service provider from installing equipment upon the request of a tenant. *See* Tex. Util. Code Ann. § 54.259.[3] Without building access for CLECs guaranteed

---

[3] Section 54.259 provides in relevant part:

  (a) If a telecommunications utility holds a consent, franchise, or permit as determined to be the appropriate grants of authority by the municipality and holds a certificate if required by this title, a public or private property owner may not:

    (1) prevent the utility from installing on the owner's property a telecommunications service facility a tenant requests;

    (2) interfere with the utility's installation on the owner's property of a telecommunications service facility a tenant requests;

    (3) discriminate against such a utility regarding installation, terms, or compensation of a telecommunications service facility to a tenant on the owner's property;

    (4) demand or accept an unreasonable payment of any kind from a tenant or the utility for allowing the utility on or in the owner's property . . .

  . . . .

  (c) Notwithstanding any other law, the commission has the jurisdiction to enforce this section.

Tex. Util. Code Ann. § 54.259 (West 1998).

through this statutory mechanism, the right of a property owner to exclude others from its property would enable it to prevent tenant choice between telecommunications providers. A property owner could prevent access to a building, demand high fees of the provider, or impose difficult and expensive conditions, thus limiting tenant choice to lease negotiations.[4] In an effort to safeguard property rights, however, the legislature provided for multiple conditions that a property owner can impose on a utility for its access to the property. *See id.* § 54.260.[5]

---

[4] We note that this problem occurs only with CLECs that choose to install their own equipment. CLECs that purchase wholesale access to the previously installed lines of other providers do not encounter this problem.

[5] Section 54.260 provides:

  (a) Notwithstanding Section 54.259, if a telecommunications utility holds a municipal consent, franchise, or permit as determined to be the appropriate grant of authority by the municipality and holds a certificate if required by this title, a public or private property owner may:

   (1) impose a condition on the utility that is reasonably necessary to protect:

      (A) the safety, security, appearance, and condition of the property; and

      (B) the safety and convenience of other persons;

   (2) impose a reasonable limitation on the time at which the utility may have access to the property to install a telecommunications service facility;

   (3) impose a reasonable limitation on the number of such utilities that have access to the owner's property, if the owner can demonstrate a space constraint that requires the limitation;

   (4) require the utility to agree to indemnify the owner for damage caused installing, operating, or removing a facility;

   (5) require the tenant or the utility to bear the entire cost of installing, operating, or removing a facility; and

6

In accordance with the legislature's directive that the Commission have the jurisdiction to enforce each provision of the Statutes, *see id*. §§ 54.259(c), .260(b), the Commission received formal comments from interested parties, held a public hearing, and conducted workshops to solicit input to enable it to promulgate a set of rules to implement the Statutes. *See* Texas Pub. Util. Comm'n*, Order Adopting New § 26.129*, Project No. 21400 (Sept. 20, 2000). Commission staff toured buildings in order to study potential space constraints and the technical aspects of installation of telecommunications equipment. *See id*. As a result of these studies, the Commission has promulgated rules with the purpose of enforcing "the non-discriminatory treatment of a telecommunications utility by the property owner upon a tenant's request for . . . services." 16 Tex. Admin. Code § 26.129(a) (2003) (Tex. Pub. Util. Comm'n, Standards for Access to Provide Telecommunications Services at Tenant Request). The rules recognize and balance the tenant's right to choose the provider of its telecommunications services, the property owner's right to manage access to the property, and the carrier's right to access the property. *Id*. § 26.129(d). The rules require the property owner and requesting carrier to negotiate reasonable compensation due the property owner for the installation, *id*. § 26.129(f), (h); however, should the parties fail to reach a negotiated agreement, either party may petition the Commission to resolve the dispute and determine

----

> (6) require the utility to pay compensation that is reasonable and nondiscriminatory among such telecommunications utilities.
>
> (b) Notwithstanding any other law, the commission has the jurisdiction to enforce this section.

Tex. Util. Code Ann. § 54.260 (West 1998).

compensation. *Id*. § 26.129(i)(3)(B)(iii).[6] The rules also direct the procedure the Commission will

use in resolving a dispute. *Id*. § 26.129(i)(4).

---

[6] Section 26.129(i)(3)(B)(iii) provides:

(iii) In determining a reasonable amount of compensation due the property owner for installation of the requesting carrier's telecommunications equipment, the commission may consider, but is not limited to, the following:

(I) the location and amount of space occupied by installation of the requesting carrier's telecommunications equipment;

(II) evidence that the property owner has a specific alternative use for any space which would be occupied by the requesting carrier's telecommunications equipment and which would result in a specific quantifiable loss to the property owner;

(III) the value of the property before and after the installation of the requesting carrier's telecommunications equipment and the methods used to determine such values;

(IV) possible interference of the requesting carrier's telecommunications equipment with the use and occupancy of the property which would cause a decrease in the rental or resale value of the property;

(V) actual costs incurred by the property owner directly related to installation of the requesting carrier's telecommunications equipment;

(VI) the market rate for similar space used for installation of telecommunications equipment in a similar property; and

(VII) the market rate for tenant leaseable space in the property or a similar property.

16 Tex. Admin. Code § 26.129(i)(3)(B)(iii) (2003).

*The Dispute*

Geoquest Center (the "property") is a 450,508 square foot commercial office building located in Houston. Appellant San Felipe, Ltd. owns the property, appellant Tanglewood Property Management Company serves as property manager, and appellant Emissary Group manages the provision of telecommunications services to property tenants. Time Warner Telecom, a licensed telecommunications utility, requested access to the property to provide service to a tenant. At that time, the property was being served by ten telecommunications service providers, all of whom had negotiated and executed license agreements with San Felipe giving them access to the property in exchange for monthly payments. Those payments ranged from $450 to $1000 per month. Time Warner and San Felipe were not able to agree on a rate after Time Warner only offered $208.03 per month for access rights. After Tanglewood and Emissary communicated to Time Warner that San Felipe had rejected the offer, Time Warner initiated a complaint proceeding at the Commission. Time Warner sought immediate forced access to the property and administrative penalties through the Commission. The Commission referred the dispute to the State Office for Administrative Hearings for a contested case hearing to determine "reasonable and fair" compensation for access to the property. *See* Tex. Util. Code Ann. § 54.260(a)(6), (b); 16 Tex. Admin. Code § 22.207 (2003) (Tex. Pub. Util. Comm'n, Referral to State Office of Administrative Hearings).

Rather than submit to the Commission's jurisdiction, the Building Owners filed suit against the Commission and the State in the district court on January 16, 2002, seeking a declaratory judgment that the Statutes are facially unconstitutional because they result in a taking of their property without providing adequate compensation. *See* U.S. Const. amend. V; Tex. Const. art. I,

9

§ 17. Based on the alleged unconstitutionality of the Statutes, the Building Owners also sought to enjoin the Commission from enforcing the Statutes and thereby have the Commission's rules invalidated. The SOAH hearings on this matter have been abated pending resolution of this facial constitutional challenge. On June 3, 2002, the district court rendered a final judgment in which it declared the Statutes to be facially constitutional and denied the Building Owners' requests for injunctive relief. This appeal followed.

## DISCUSSION

*Delegation of Power*

We will first address the Building Owners' second issue. The Building Owners contend that, although the legislature granted the Commission the jurisdiction to "enforce" the Statutes, the Commission's enforcement power does not translate into the power to settle a dispute between a utility and a property owner when the latter requires that the former pay compensation for access to the property. We disagree.

The powers of the Commission include the powers delegated by the legislature in clear and express statutory language, together with any implied powers that may be necessary to perform a function or duty delegated by the legislature. *GTE Southwest, Inc. v. Public Util. Comm'n*, 10 S.W.3d 7, 12 (Tex. App.—Austin 1999, no pet.). We may imply that the legislature intended that an agency would have whatever power would be reasonably necessary to fulfill a function or perform a duty that the legislature has expressly placed in the agency. *Id*.; *see also Kawasaki Motors Corp. U.S.A. v. Texas Motor Vehicle Comm'n*, 855 S.W.2d 792, 797 (Tex. App.—Austin 1993, no writ); *Texas Dep't of Human Servs. v. Christian Care Ctrs., Inc.*, 826 S.W.2d 715, 719 (Tex. App.—Austin

10

1992, writ denied). Finally, a particular provision of a statute or code can give a commission or agency specific authority to order payments between private parties for purposes of that section. *See Sportscoach Corp. of Am., Inc. v. Eastex Camper Sales, Inc.*, 31 S.W.3d 730, 735 (Tex. App.—Austin 2000, no pet.).

We begin by examining the language of the statute itself. Statutory construction is a question of law, which we review *de novo*. *Johnson v. City of Fort Worth*, 774 S.W.2d 653, 656 (Tex. 1989). The primary rule of statutory interpretation is to read the enactment as a whole and to construe the statute so as to give effect to legislative intent. *State v. Public Util. Comm'n*, 883 S.W.2d 190, 196 (Tex. 1994); *Citizens Bank v. First State Bank*, 580 S.W.2d 344, 348 (Tex. 1979). In particular, when considering questions concerning PURA, we must read PURA as a whole to determine the scope of the Commission's authority. *Public Util. Comm'n*, 883 S.W.2d at 196.

With these standards in mind, we emphasize that within the wider context of regulating the telecommunications industry, the legislature has given the Commission a uniquely difficult task: to balance the property rights of building owners with the policy goals of ensuring market-based competition in the provision of telecommunications services in multi-tenant buildings. In order to empower the Commission to oversee this carefully balanced system of rights, the legislature created a framework for the Commission to resolve the disputes that would inevitably arise. The legislature thus included specific directives that the Commission "has the jurisdiction to enforce" the Statute's provisions. Tex. Util. Code Ann. §§ 54.259(c), .260(b). This grant of power means that the Commission has the express authority to enforce the rights set out in those statutes, including the right of the property owners to "require the utility to pay compensation that is

11

reasonable and nondiscriminatory among such telecommunications utilities." *Id*. § 54.260(a)(6); *see also id*. § 54.259(a)(4) (property owner may not demand or accept unreasonable payment of any kind from tenant or utility for allowing utility on or in owner's property). A plain reading of the statutory language thus leads us to conclude that, within the system of rights created by the Statutes, the Commission is charged with balancing the property owner's right to receive adequate compensation and the utility's right to access the property without having to pay unreasonable and discriminatory compensation.

Furthermore, when the legislature expressly confers power on an agency, as it does here, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express duties. *Public Util. Comm'n v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 316 (Tex. 2001). Thus, when private parties cannot determine what is "reasonable" and "nondiscriminatory" compensation in a particular case, the Commission's power to resolve that dispute by determining compensation becomes reasonably necessary to enforce the demands of the Statutes. Otherwise, having the "jurisdiction to enforce" would be hollow and meaningless, creating a result clearly contrary to the intent of the legislature. *See Public Util. Comm'n v. City of Austin*, 728 S.W.2d 907, 915 (Tex. App.—Austin 1987, writ ref'd n.r.e.).

The Building Owners contend that implying the Commission's power to determine compensation creates a conflict between the Statutes and the Commission's general enforcement powers set out in subchapter B of PURA. *See generally* Tex. Util. Code Ann. §§ 15.021-.033 (West 1998). We disagree. Because the Commission's express jurisdiction to enforce sections 54.259(a)(4) and 54.260(a)(6) must include the power to determine "reasonable" and

12

"nondiscriminatory" compensation when the parties cannot agree, it stands to reason that when the Commission follows its procedures and issues a determination it must ensure compliance with that determination by invoking its enumerated enforcement powers. Among these powers, the Commission may apply for court orders to enjoin or require compliance, may file a court action for contempt against a party for failure to comply with an order of the Commission, and may assess penalties. *See id.* §§ 15.021, .022, .023. Thus, the Commission's use of its general enforcement powers will only result when it issues an order or determination. Here, any such order or determination only results from use of its specific grant of authority to enforce the provisions of the Statutes. Because the Commission's jurisdiction to enforce the Statutes derives from a different, specific, grant of authority and applies to different stages in the procedure than its general enforcement powers, the legislature's use of the word "enforce" in the Statutes can include a determination of compensation by the Commission even though this power is not explicitly set out among its subchapter B general enforcement powers.

The Building Owners also argue that the legislature can never delegate to an agency the authority to resolve disputes between private parties. However, the leading cases on which they rely are distinguishable, and in fact stand for the proposition that an agency can and often does have that power when the legislature constructs statutes that make clear its intent. For example, in *GTE Southwest*, this Court considered a Commission order that required GTE, a telecommunications utility, to consolidate the "demarcation point" of telecommunications hardware located outside the buildings of an apartment complex into a single point on the property line, and to create access on their lines for other providers. *GTE Southwest*, 10 S.W.3d at 9-10. We held that the Commission

13

lacked the authority to compel GTE to surrender its lines for the use of other private entities because nowhere in PURA did the legislature *expressly* provide for such a taking. *Id*. at 11-12. Nor could "statutes that give the Commission general and broadly stated powers to regulate and supervise public utilities and to perform quite general duties and functions" adequately support an implied taking power by the Commission. *Id*. at 12. Thus, our holding in *GTE Southwest* was limited to the proposition that the Commission cannot rely on its general power to regulate and supervise utilities to resolve a particular dispute between private parties. *Id*. at 12-13. At issue here is the Commission's power to determine compensation pursuant to a *specific* enforcement provision provided in a regulatory scheme established by the legislature to guarantee building access for telecommunications providers. Thus, when courts consider an agency's attempt to resolve a dispute between private parties, the fundamental issue for analysis becomes whether the agency relies on a general grant of authority or on a specific grant of authority. *GTE Southwest* involved a general grant of authority while this case involves a specific grant.

The Building Owners also direct us to this Court's decision in *Sportscoach Corp. of America, Inc. v. Eastex Camper Sales, Inc.*, 31 S.W.3d 730 (Tex. App.—Austin 2000, no pet.), to insist that the Commission has no authority to determine compensation. *Sportscoach* involved a challenge to the Texas Motor Vehicle Board's order that an automobile manufacturer pay damages, attorney's fees, and interest to a vehicle dealership resulting from termination of the dealer's franchise. We held that the statutory language at issue in the motor vehicle commission code did not grant the Board authority to unilaterally extend its remedies options to award damages to a

14

private party. *See id*. at 734-35.[7] Furthermore, because the provision violated by the manufacturer

did not specifically grant the Board authority to order payment to the dealer, we rejected the Board's

argument that its general enabling statutes constituted specific statutory authority to adjudicate the

dealer's claims. *See id*.

Thus, in *Sportscoach*, we concluded that a general grant of jurisdiction to regulate an

industry does not give an agency authority to order payments between private parties for violations

of a particular statutory provision. *Id.* at 735. However, we also noted that section 6.07(g) of the

motor vehicle commission code gave the Board the specific authority to order reimbursements. *Id*.

(stating that the language "the Director shall makes its order with respect to" grants director of

Motor Vehicle Board authority to make orders on subject matter within that discrete section of

statute); Act of June 19, 1983, 68th Leg., R.S., ch. 652, § 7, 1983 Tex. Gen. Laws 4134, 4143

(current version at Tex. Rev. Civ. Stat. Ann. art. 4413(36), § 6.07(g) (West Supp. 2003)). Thus, the

legislature can specifically delegate to an agency the authority to resolve disputes between private

parties so long as that delegation is sufficiently specific in relation to those parties' statutory rights.

The legislature's directive that "the commission has jurisdiction to enforce" functions in a way

similar to section 6.07(g) of the motor vehicle commission code because it indicates a grant of power

to a particular agency over a discrete section of a statute. Because the legislature made a specific

---

[7] The relevant statute at issue in *Sportscoach* was article 4413(36) of the revised civil statutes. Then section 5.02(b)(16) of the motor vehicle commission code provided that a manufacturer failing to make certain payments upon termination of a dealer's franchise was liable for dealer costs, fair market value or current price of the inventory, interest, attorney's fees, and costs. *See* Tex. Rev. Civ. Stat. Ann. art. 4413(36), *amended by* Act of May 18, 2001, 77th Leg., R.S., ch. 155, § 14, 2001 Tex. Gen. Laws 313, 321 (current version at Tex. Rev. Civ. Stat. Ann. art. 4413(36), § 5.02(b)(16)(F) (West Supp. 2003)).

grant to the Commission of jurisdiction to enforce the Statutes, we can distinguish this case from *Sportscoach*.

In light of the plain meaning of the statutory language and case law,[8] we hold that the provisions granting the Commission jurisdiction to enforce sections 54.259(a)(4) and 54.260(a)(6) delegates to the Commission the power to determine "reasonable" and "nondiscriminatory" compensation when a property owner and telecommunications utility fail to negotiate the amount.[9] We overrule the Building Owners' second issue.

---

[8] The Building Owners also refer us to our recent decision in *Lakeshore Utility Co. v. Texas Natural Resource Conservation Commission*, 92 S.W.3d 556 (Tex. App.—Austin 2002, pet. filed). However, the relevant discussion in *Lakeshore* concerns the ability of the attorney general to bring injunction suits in the absence of a commission order. *Id.* at 565; *see also* Tex. Water Code Ann. § 13.411(a) (West 2000). Insofar as *Lakeshore* addressed the issue of commission resolution of private-party disputes, we assumed that statutory language can be plain and unambiguous in delegating such authority to a commission. *Lakeshore*, 92 S.W.3d at 563-64; *see also* Tex. Water Code Ann. § 13.187(i) (West Supp. 2003).

[9] The Building Owners make the additional argument that the Statutes conflict with the eminent domain provisions of the Texas Property Code. *See generally* Tex. Prop. Code Ann. ch. 21 (West 1984, 2000, & Supp. 2003). They urge that, as a result of this conflict, public policy dictates that eminent domain rights and procedures should apply in this case. Assuming without agreeing that this case would be an example of eminent domain, the legislature foresaw that the Statutes may conflict with other Texas statutory schemes and expressly decided that the Commission has the power to enforce the Statutes, "[n]otwithstanding any other law." Tex. Util. Code Ann. §§ 54.259(c), .260(b) (West 1998). This decision applies only to the Statutes. *Id.* As a result, a reasonable interpretation of the legislature's intent would be that the Statutes, in the narrow class of cases that they cover, trump the eminent domain provisions in case of conflict. *See Texas Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 520 (Tex. 1995); *GTE Southwest, Inc. v. Public Util. Comm'n*, 10 S.W.3d 7, 12-13 (Tex. App.—Austin 1999, no pet.). Therefore, unless we were to find the Statutes unconstitutional, we have no need to address the eminent domain argument of the Building Owners.

*Legislative Guidance*

In their third issue, the Building Owners contend that, even if the Commission has the authority to determine compensation, the Statutes do not contain sufficient standards to guide the Commission in making its determination. This lack of standards, they argue, renders the delegation of power to the Commission unconstitutional. *See* Tex. Const. art. II, § 1. We disagree. The legislature may delegate its powers to administrative agencies and commissions it establishes to carry out legislative purposes, so long as it establishes reasonable standards to guide the entity to which it delegates power. *Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 740 (Tex. 1995). The legislature is not required to include every detail or anticipate every circumstance when delegating power. *Id*. Nor will a statute be invalid because of failure to include specific details. *Railroad Comm'n v. Lone Star Gas Co.*, 844 S.W.2d 679, 689 (Tex. 1992). Thus, broad standards included in legislative delegation may pass constitutional scrutiny. *Edgewood*, 917 S.W.2d at 740-41 (upholding delegation empowering commissioner of education to adopt rules and to make adjustments to funding elements in Texas Education Code).

A constitutional standard may be broad and encompass a multitude of factors if it is no more extensive than the public interest demands. *Jordan v. State Bd. of Ins.*, 334 S.W.2d 278, 280 (Tex. 1960); *Housing Auth. v. Higginbotham*, 143 S.W.2d 79, 87 (Tex. 1940). If the idea embodied in a phrase is reasonably clear, a court should find it to be acceptable as a standard of measurement. *Jordan*, 334 S.W.2d at 280. As a result, the supreme court has upheld a statutory grant of power to the commissioner of insurance to determine if an officer or director of an insurance company is "not worthy of public confidence." *Id*. The legislature may delegate authority to prohibit

17

insurance policy forms that are "unjust, unfair, inequitable, misleading, [or] deceptive." *Key W. Life Ins. Co. v. State Bd. of Ins.*, 350 S.W.2d 839, 848-850 (Tex. 1961). With respect to PURA, the supreme court has upheld as a valid delegation the grant of power to the Commission to determine electricity rates that are "just, and reasonable," and not "discriminatory." *Texas Alarm & Signal Ass'n v. Public Util. Comm'n*, 603 S.W.2d 766, 772 (Tex. 1980); *see also* Tex. Util. Code Ann. § 36.003(a), (b) (West 1998).[10]

Here, the Statutes delegate authority to the Commission to enforce the right of a property owner to require a utility to pay "reasonable" and "nondiscriminatory" compensation when a utility gains access to the property. Tex. Util. Code Ann. § 54.260(a)(6). As we have already determined, this delegation includes the power to determine what is reasonable and nondiscriminatory when there is a dispute between the parties. Given the policy goals underlying the Statutes, it makes sense that the legislature may delegate to the Commission the power to create rules that reflect its vast experience with the procedures and realities of the telecommunications industry. The Commission's determinations of compensation must be done against the backdrop of

---

[10] We can discern at least two other approaches to the problem of sufficient statutory guidance in delegation of powers cases, although neither of those approaches would apply in this case. *See In re Johnson*, 554 S.W.2d 775 (Tex. Civ. App.—Corpus Christi 1977, writ ref'd n.r.e); *Texas Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454 (Tex. 1997). In *In re Johnson*, the court of appeals found that the language "reasonable" and "non-discriminatory" can constitute an unbridled delegation of power when the legislature delegates power *to the judiciary*. 554 S.W.2d at 779-82. Thus, a delegation of power to the judiciary may require an evaluation specific to that context. *See id.* Second, in *Texas Boll Weevil*, the supreme court considered the delegation of power from the legislature to a private entity. 554 S.W.2d at 469-75. Although the court set forth a specific test for evaluating delegation of power, it expressly limited its holding to cases concerning delegations to private entities. *Id.* at 472-73. In doing so, it also upheld the traditional delegation doctrine when considering delegations to public agencies. *Id.*

18

the history of that complex industry and the evolving public policy goals of the State. Thus, what "reasonable" and "nondiscriminatory" compensation may be in any particular dispute remains a fact-intensive inquiry, and the legislature's prescribed standard of "reasonable" and "nondiscriminatory" allows the Commission discretion to determine the best method of distinguishing between relevant factors. It also gives the Commission the discretion to consider multiple factors that the legislature may not be able to foresee and to decide the relevancy and weight of those factors in each particular circumstance. *See Texas Alarm & Signal Ass'n*, 603 S.W.2d at 772; *Public Util. Comm'n v. Eastland Elec. Co.*, 701 S.W.2d 261, 266-67 (Tex. App.—Austin 1985, writ ref'd n.r.e.). We hold that the legislative guidance provided to the Commission in the Statutes passes constitutional muster. *See Texas Alarm & Signal Ass'n*, 603 S.W.2d at 772. We overrule the Building Owners' third issue.

### *Unconstitutional Takings*

In their first issue, the Building Owners argue that the Statutes are facially unconstitutional because "as written, and taken as a whole," they cause a taking of private property without providing a reasonable, certain and adequate procedure for determining compensation. *See* U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation."); Tex. Const. art. I, § 17 ("No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made . . . ."). Specifically, the Building Owners complain that the government has physically taken their property by compelling them, as property owners, to surrender their right to exclude utilities from physical use of the property. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982) (statute prohibiting owner of rental property from interfering with installation of cable-television

19

facilities on her property). An analysis of the constitutionality of a statute begins with a presumption of validity, and we must, if possible, construe statutes to avoid constitutional infirmities. *General Servs. Comm'n v. Little-Tex Insulation Co., Inc.*, 39 S.W.3d 591, 598 (Tex. 2001); *Nootsie, Ltd. v. Williamson County Appraisal Dist.*, 925 S.W.2d 659, 662 (Tex. 1996); *Texas State Bd. of Barber Examiners v. Beaumont Barber College, Inc.*, 454 S.W.2d 344, 347-48 (Tex. 1970).

According to the Building Owners, the precise mode and method for determining compensation must be written into the Statutes. For support, they cite *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 194 (1985), and *Lone Star Gas Company v. City of Fort Worth*, 98 S.W.2d 799, 802 (Tex. 1936). In *Williamson County*, the United States Supreme Court construed "just compensation" to require that a reasonable, certain and adequate provision for obtaining compensation exist at the time of the taking; therefore, "[i]f the *government* has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner 'has no claim against the Government' for a taking." *Williamson County*, 473 U.S. at 194-95 (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1013, 1018 n.21 (1984)) (emphasis added). Here, the government—acting through the Commission—has relied on an express enforcement provision in the Statutes to adopt detailed rules that provide a process for obtaining compensation. *See* 16 Tex. Admin. Code § 26.129. Thus, on their face, the Statutes provide for the existence of a reasonable, certain and adequate provision for obtaining compensation. As written, we cannot say that the Statutes fail to satisfy *Williamson County*, which does not require the stringent standard urged by the Building Owners.

The Building Owners also rely on *Lone Star Gas Co. v. City of Fort Worth*, for the proposition that a statute authorizing a taking must, as written, provide "the mode and manner of

20

ascertaining the amount of compensation." 98 S.W.2d at 802. We are not persuaded. There is no dispute that the "adequate compensation" requirement of article I, section 17 of the Texas Constitution has been construed to be synonymous with the "just compensation" provision of the Fifth Amendment. *See Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 628 (Tex. 1996). Thus, this situation is controlled by the United States Supreme Court's interpretation of what satisfies "just compensation"; and as we have discussed, the Statutes satisfy that requirement. *See Williamson County*, 473 U.S. at 194-95.

Furthermore, the specific holding in *Lone Star Gas* is not entirely clear, as the parties' briefing shows. As interpreted by one court of appeals, the holding in *Lone Star Gas* does not stand for the broad proposition for which the Building Owners cite it: "The ultimate holding of *Lone Star* is that some process must be established, either by general statute or through a city's charter, which provides security for any utility that may be condemned." *City of Houston v. Southern Water Corp.*, 678 S.W.2d 570, 572 (Tex. App.—Houston [14th Dist.] 1984, writ dism'd). Finally, if *Lone Star* required that a statute authorizing a taking also provide written details for the method of determining compensation—which under the circumstances of the regulatory scheme at issue would require the legislature to spell out in the Statutes something akin to the Commission's rules—then *Lone Star* would appear to conflict with the supreme court's more recent holding in *Barshop*. *See Barshop*, 925 S.W.2d at 630 (holding Edwards Aquifer Act not facially unconstitutional because statutory provision that Texas Legislature "intends that just compensation be paid if implementation of [Act] causes a taking of private property" satisfies adequate procedure requirement).

The Building Owners attack the Commission's rules only by way of claiming that the Commission lacks authority to establish those procedures. They do not separately claim that the

21

rules themselves fail to provide adequate procedures for determining just compensation. Thus, we need not address the issue of whether resort to the process for obtaining compensation provided by the government in this case will ultimately provide just or adequate compensation to the Building Owners. *Williamson County*, 473 U.S. at 194. Having already decided that the legislature constitutionally delegated to the Commission the power to establish a procedure for determining compensation, we need only hold that, as written, the Statutes are not facially unconstitutional. Because a lack of adequate procedures to establish compensation is a necessary element to establish a claim under the takings doctrine, the Building Owners cannot have a takings claim until they have availed themselves of the Commission's procedures and have been denied just compensation.[11] *Id*. at 195. We overrule the Building Owners' first issue.

## CONCLUSION

Our holding today recognizes the important role that the Building Access Statutes play in achieving the state's policy objective to transition from traditional telecommunications regulation to a competitive marketplace. The Statutes promote competition by ensuring that tenants in multi-tenant buildings have the ability to choose their provider of telecommunications services. Without them, a property owner can prevent access to the building or decide which telecommunications provider will be allowed to serve tenants and on what terms and conditions.

This Court has little doubt that the legislature intended that the policy of competition

---

[11] Because the Building Owners have not established a claim under the inadequate provision of compensation prong of takings doctrine, we have no need to determine either if a taking exists under the provisions of the Statutes or if the application of the Statutes will always result in such a taking. *See, e.g.*, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434-37 (1982); *Texas Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 520 (Tex. 1995).

would impact the Building Owners' property rights in specific situations; however, the legislature designed the Statutes to balance the forces of competition and consumer choice with the rights of property owners to be compensated in the event of a taking. The Statutes expressly delegate to the Commission the power to establish a procedure whereby the Building Owners can obtain adequate compensation. The Building Owners have not directly challenged this procedure. Nor have they availed themselves of that procedure and then sought judicial review of an adverse administrative order. The Building Owners' contentions on appeal evince a preference to dismantle the procedure and then complain that the Statutes are unconstitutional because they provide no adequate procedure for compensation. We agree with the Commission's characterization of this as an unsuccessful "attempt to self-inflict a denial of due process." We overrule the Building Owners' issues on appeal and, accordingly, affirm the judgment of the district court.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed:   June 5, 2003

23