TEXAS DEPARTMENT OF
BANKING, Appellant,

v.

RESTLAND FUNERAL HOME,
INC., et al., Appellees.

No. 3–92–293–CV.

Court of Appeals of Texas,
Austin.

Feb. 17, 1993.

Dan Morales, Atty. Gen., Karen B. Pettigrew, Asst. Atty. Gen., Austin, for appellant.

Patton G. Lochridge, McGinnis, Lochridge & Kilgore, Austin, for appellees.

Before POWERS, ABOUSSIE and B.A. SMITH, JJ.

POWERS, Justice.

Restland Funeral Home, Inc. and others sued the Texas Department of Banking to determine the validity and applicability of a rule issued by the Department.[1] *See* Texas Administrative Procedure and Texas Register Act (APTRA), Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 12 (West.Supp.1993). The district court rendered its declaratory judgment that the rule was invalid in its entirety. The Department appeals. We will affirm the judgment.

## THE REGULATORY STATUTE

The Department is a component of the Finance Commission of Texas, and the Banking Commissioner of Texas is charged to enforce, through the Department, the provisions of Tex.Rev.Civ.Stat.Ann. art. 548b (West 1973 & Supp.1993).[2] Article 548b gives the Department regulatory powers over the business of selling prepaid funeral services and merchandise, a business in which Restland and the other appellees, save one, engage. The primary purpose of article 548b is to protect purchasers who have contracted and paid in advance (ordinarily by installment payments) for funeral services and merchandise to be supplied upon the death of individuals specified in the contracts.[3]

The present dispute arises under section 5 of article 548b. That section authorizes a seller to retain ten percent from sums paid by the purchaser; any sums received over this percentage must be deposited in a trust account maintained by the seller to secure his obligation to provide the funeral services and merchandise when required. § 5(2). The seller may withdraw some amounts, from time to time, for specified purposes. § 5(4). He may, for example, withdraw "excess earnings" from the trust account, a term which means "funds in the trust deposit that exceed 107 percent of the seller's obligations on each contract for which deposits have been made." *Id.* Withdrawals of excess earnings may be made only on the Commissioner's authorization, given on the seller's application and after notice and hearing under APTRA, when the evidence shows and the Commissioner concludes that the seller's ability to perform the contract "is not diminished by the withdrawal." *Id.* Section 5 authorizes the Commissioner to promulgate rules setting out factors that may be considered in evaluating each application to withdraw ex-

1. The plaintiffs below, and appellees here, are Restland Funeral Home, Inc., Laurel Land Funeral Home, Inc., Singing Hills Funeral Home, Inc., and Bluebonnet Hills Funeral Home, Inc. The Texas Funeral Home Directors Association, Inc. was an intervenor below and is an appellee here.

2. *See* Tex.Rev.Civ.Stat.Ann. arts. 342–101–107, 109–115, (West Supp.1993), art. 342–108 (West 1973), arts. 342–201–211 (West Supp.1993).

3. Article 548b provides that the Department shall administer the statute (§ 2) and authorizes the familiar techniques of regulation: the sale of prepaid funeral services and merchandise is prohibited except under an annual permit issued by the Department (§§ 1, 3, 9); the Department may, after notice and hearing, cancel a permit or refuse to renew it for the holder's failure to comply with the statute or any valid rule which the Department has prescribed (§ 4);

the seller cannot enforce contracts for the sale of funeral services or merchandise if made in violation of the statute (§ 11); the provisions of the statute are enforceable against sellers by criminal sanctions and quo warranto proceedings (§ 9); and very broad rulemaking powers are vested in the Department to implement the statutory provisions in detail (§ 2).

Section 5 of article 548b is discussed in the text insofar as it pertains to the requirement which it imposes upon sellers to maintain trust accounts securing their obligations under their contracts for prepaid funeral services and merchandise. Section 8A of article 548b secures these obligations in another way by providing for a guaranty fund, established and refreshed by annual assessments against sellers, for the benefit of purchasers whose sellers have defaulted.

cess earnings. Curiously, however, the Commissioner's "decision on whether to grant the withdrawal is not limited to those factors." *Id.*

## THE CONTROVERSY

With the stated purpose of protecting consumers, facilitating the fair processing of applications to withdraw excess earnings, and establishing factors to be considered in that regard, the Department adopted its present Rule 25.14. Among other things, the new rule defined the crucial term "seller's obligation," the base amount from which is calculated the 107 percent ceiling imposed by article 548b, section 5(4). Section (c)(4) of Rule 25.14 declares as follows:

Seller's obligation—The seller's obligation under the prepaid funeral contracts is, at minimum, the greater of:

A. the actual cost of delivering of funerals identified in the contracts that are represented in the application;

B. the contract price and/or amount paid in by the purchaser on each contract; or

C. the *current retail price* of providing the contracted services and merchandise represented by the contracts that make up the application for withdrawal. The retail price is to be computed as follows:

\* \* \* \*

(emphasis added).

The appellees sued under APTRA § 12 to obtain a declaratory judgment that the rule was invalid on several grounds, among them a complaint that inclusion of the "current retail price" provision in the foregoing definition exceeded the authority given the Department in article 548b, section 5(4). The district court agreed and, in addition, held that the entirety of Rule 25.14 was invalid because the remainder of the rule was not severable from the invalid part.

In its appeal, the Department agrees that the "current retail price" provision of Rule 25.14 is invalid. The Department contends, however, that the district court erred in striking down the entirety of Rule 25.14 because there was "no evidence" to support three "findings of fact" from which that court assertedly inferred its conclusion that the remainder of the rule was not severable from the defective part. In this contention, the Department refers to "findings of fact" 14, 15, and 26. These declare as follows:

14. The Texas Department of Banking and the Commissioner of Banking made no attempt to balance the different legislative purposes of art. 548b and its amendments, and improperly ignored the legislative mandate to allow the withdrawal of excess earnings.

15. The Rule imposes burdens not in the statute, art. 548b.

\* \* \* \*

26. All of the provisions of Rule 25.14 are so inseparably connected in substance and are so intertwined and dependent on each other that severability of one provision is not possible.

The Department therefore requests that we affirm the part of the district-court judgment declaring invalid the "current retail price" provision, reverse that part of the judgment striking down the entirety of Rule 25.14, and modify accordingly the judgment below.

We believe findings 15 and 26 are patently conclusions of law and that finding of fact 14 is unnecessary to the district-court judgment. In our view we must sustain the judgment, as a matter of law, on the legal basis discussed below.

## DISCUSSION AND HOLDINGS

The measure of the validity of a statute is whether it is constitutional. If a part only is unconstitutional, the question of severance depends upon whether the unconstitutional part is so clearly independent of the remaining parts that the reviewing court is able to conclude that the legislature would have enacted the statute even without the part that is held unconstitutional. *Association of Tex. Professional Educators v. Kirby,* 788 S.W.2d 827, 830–31 (Tex.1990); *Texas & P. Ry. Co. v. Mahaffey,* 98 Tex. 392, 84 S.W. 646, 648 (1905).

This, however, is not precisely the test for severance in the case of an agency rule.

The measure of the validity of an agency rule is whether it is constitutional and whether it conforms to the procedural and substantive statutes applicable to its adoption. If a part only is invalid, the severance decision depends on the court's determination of two issues: (1) will the function of the regulatory statute as a whole be impaired without the invalid part of the rule; and (2) is there any indication that the agency would not have adopted the rule but for the invalid part? If the answer to either query is "yes," in the court's view, then severance is not justified and the entire rule must fall. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 295, 108 S.Ct. 1811, 1819, 100 L.Ed.2d 313 (1988).

In the present case, the Department assured us in oral argument that severance of the invalid part of Rule 25.14 (the "current retail price" element of the definition of "seller's obligation") will not impair the operation of the rule. By implication, perhaps, we may assume that this extends to the operation of article 548b as a whole. We will assume as much for the purposes of discussion. We turn then to the second inquiry: Is there any indication that the Department would not have adopted the rule but for the invalid part? We believe there is a strong indication to that effect and that the only reasonable answer is "yes."

We are obliged to respect the autonomy of state administrative agencies in their administration of regulatory statutes. And this attitude requires caution in what we may impute to their rulemaking and other actions. An instructive case, and one very similar to the present case, is *Addison v. Holly Hill Fruit Products*, 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944). In *Addison* the agency promulgated a rule in connection with its administration of the Fair Labor Standards Act. The Act excluded from its scope any employees engaged in canning agricultural commodities provided the employees worked within the "area of production," a term the agency was au-

thorized to define. The resulting agency rule defined the term first by geographical limits ("immediate locality") and second by the number of employees employed in the business establishment (not more than seven). The circuit court of appeals held the second element of the definition invalid as being in excess of the agency's statutory authority. The court then severed that part of the definition and decided the appeal based solely on the first element of the definition, holding that the employees, being within the geographical limits, were exempt from the provisions of the Act. In its review, the Supreme Court agreed that the circuit court of appeals held correctly that the rule limitation on number of employees was invalid. The Supreme Court, however, disagreed with the severance of that element. The Court stated:

> Since the provision as to the number of employees was not authorized [by the Act], the entire definition of which that limitation was a part must fall. *We can hardly assume* that the Administrator would have defined "area of production" merely by deleting the employee provision, had he known of its invalidity. It would be the sheerest of *guesswork* to believe that elimination of an important factor in the Administrator's equation would have left his equation unaffected even if he did not here insist upon its importance. It is not for us to write a definition. That is the Administrator's duty.

322 U.S. at 618–19, 64 S.Ct. at 1222 (emphasis added).

In the present case, there are very strong and affirmative indications that the "current retail price" element of the "seller's obligation" was viewed as *essential* to the adoption of the rule-based definition of the latter term, notwithstanding the Department's present, *post hoc* position to the contrary. We refer to the comments the Department made in responding to public comments following initial publication of the rule. *See* 14 Tex.Reg. 1582 (1989).

One person commented that the "current retail price" element of the definition of "seller's obligation" was "too onerous a

burden and would create problems in obtaining accurate information from competing funeral homes." *Id.* Another person commented that the seller's obligation should be defined as cost of goods sold. The Department responded as follows: (1) neither the "actual cost" nor the "contract price" of a funeral would meet the purchaser's expectation of securing a funeral at the time of death; (2) neither definition would secure the statutory objective of "ensuring that the funds are available to provide for the delivery of the funeral at the time the contract matures"; (3) "[i]n the event the seller is unable or unwilling to provide the funeral services or merchandise identified in the contract, the purchaser would have to ... purchase from another funeral home equivalent services and merchandise"; (4) "[t]herefore, it is the department's opinion that the current retail price of the funeral service and merchandise ... *must* be considered in determining the seller's obligation." *Id.* (emphasis added). Moreover, the Department declared the "contract price" element of the definition of "seller's obligation" pertains "only to situations where the purchaser elects to cancel his contract." *Id.*

Elsewhere, the Department responded to another comment by stating that a determination of "actual cost" was impractical in some cases because "[t]he cost of obtaining actuarial studies to calculate seller's obligation would be prohibitive for small funeral homes, and the department is attempting [by using the definition "actual costs," "contract price," and "current retail price"] to define seller's obligation in a manner in which the interests of purchasers of prepaid funeral contracts are protected and all applicants are able to calculate their obligation based on *current* and available data." *Id.* at 1583 (emphasis added).

Finally, the Department stated that it agreed with one individual's comment that the "current retail price" element was essential to avoid the mistake the Department made 25 or 30 years previously when purchasers were able to obtain, in lieu of the services and merchandise specified in their contracts, only the cash-surrender value of their contracts or the face value thereof. In those instances, the purchasers were unable to purchase the funeral specified in the contract "because of the increased costs of funerals over the years." The Department stated that it had incorporated in the rule the provisions necessary to avoid that problem. *Id.* at 1584.

The Department now asks us, in effect, to conclude that it would have defined "seller's obligation" solely in terms of "actual cost" and "contract price" had it known that "current retail price" was an impermissible part of its formulation of the definition of "seller's obligation." We believe no reasonable person could conclude, in the face of the comments and departmental responses summarized above, that this is the case. We conclude the Department would not have adopted Rule 25.14 but for the "current retail price" element of the definition of "seller's obligation." We hold, therefore, that the district court did not err in its judgment striking down Rule 25.14 in its entirety. Because of our disposition above, we do not reach the appellees' cross-point of error.

Accordingly, we affirm the district-court judgment.