TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-07-00682-CV






Texas Mutual Insurance Company, Liberty Mutual Insurance Company,

Zenith Insurance Company and Zurich American Insurance Company,

Appellants


v.


Vista Community Medical Center, LLP, d/b/a Vista Medical Center Hospital;

Christus Health Gulf Coast; and The Texas Department of Insurance,

Division of Workers' Compensation, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT

NO. D-1-GN-06-000213, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING




O P I N I O N



 This appeal concerns a challenge to the validity of a rule promulgated by the
Texas Department of Insurance, Division of Workers' Compensation, (1) regarding hospital
fee reimbursement for inpatient services to injured workers' compensation patients. See 22 Tex.
Reg. 6264-308 (July 4, 1997) (originally codified at 28 Tex. Admin. Code § 134.401), repealed,
33 Tex. Reg. 5319 (July 4, 2008). Appellee Vista Community Medical Center, LLP, d/b/a Vista
Medical Center Hospital filed suit against the Division and appellant Texas Mutual Insurance
Company in a medical fee reimbursement dispute seeking a declaratory judgment that the "Stop-Loss
Exception" in Rule 134.401 (2) was invalid. Another hospital, appellee Christus Health Gulf Coast,
and several insurance carriers, including appellants Liberty Mutual Insurance Company, Zenith
Insurance Company, and Zurich American Insurance Company, intervened and sought competing
declarations regarding the validity of Rule 134.401. The trial court severed the parties' claims for
declaratory relief and, after a bench trial, issued a final judgment granting declaratory relief in favor
of the hospitals and rejecting the Division's interpretation of the Stop-Loss Exception. Because we
conclude there was error in the trial court's judgment, we affirm the trial court's judgment in part,
and reverse and render in part.


FACTUAL AND PROCEDURAL BACKGROUND


 In 1989, the Texas Legislature enacted a new Workers' Compensation Act that
restructured workers' compensation law in Texas. See Tex. Lab. Code Ann. §§ 401.001-506.002
(West 2006 & Supp. 2008). (3) The Act charged the Division with the difficult task of developing
medical fee reimbursement guidelines that would ensure quality medical care for injured workers
and achieve effective medical cost control. Id. § 413.011; see also Patient Advocates v. Texas
Workers' Comp. Comm'n, 80 S.W.3d 66, 71 (Tex. App.--Austin 2002), aff'd in part, rev'd in part,
136 S.W.3d 643 (Tex. 2004). To satisfy its legislative mandate to balance these competing
legislative policy goals, the Division adopted the 1992 hospital reimbursement guideline, which was
invalidated by this Court in 1995 for lack of a reasoned justification. See Texas Hosp. Ass'n v. Texas
Workers' Comp. Comm'n, 911 S.W.2d 884, 885-86, 888 (Tex. App.--Austin 1995, writ denied)
(declaring "Rule 400" void because it failed to include reasoned justification as required by
section 2001.033 of the APA). In the wake of this Court's decision, the Division adopted the 1997
guideline, including the Stop-Loss Exception, at issue in this appeal. See 22 Tex. Reg. 6264.


The 1997 Guideline

 With certain exceptions, the 1997 guideline provides that hospitals are to be
reimbursed for inpatient admissions under a standard per diem methodology based on the category
of admission. See generally Rule 134.401(c)(1)-(2). The 1997 guideline also specifies two
exceptions to the standard per diem reimbursement methodology. Id. 134.401(c)(2)(C). These two
exceptions apply on a case-by-case basis and include the "Trauma-Burn-HIV," or "TBHIV,"
exception, and the Stop-Loss Exception. See id. 134.401(c)(5) & (6). Only the Stop-Loss Exception
is at issue in this appeal.

 With regard to the Stop-Loss Exception, Rule 134.401(c)(6) provides:


 Stop-loss is an independent reimbursement methodology established to ensure fair
and reasonable compensation to the hospital for unusually costly services rendered
during treatment to an injured worker. This methodology shall be used in place of
and not in addition to the per diem based reimbursement system. The diagnosis
codes specified in paragraph (5) of this subsection are exempt from the stop-loss
methodology and the entire admission shall be reimbursed at a fair and reasonable
rate.


 (A) Explanation


 (i) To be eligible for stop-loss payment the total audited charges for a
hospital admission must exceed $40,000, the minimum stop-loss
threshold.


 (ii) This stop-loss threshold is established to insure compensation for
unusually extensive services required during an admission.


 (iii) If audited charges exceed the stop-loss threshold, reimbursement for
the entire admission shall be paid using a Stop-Loss Reimbursement
Factor (SLRF) of 75%.


 (iv) The Stop-Loss Reimbursement Factor is multiplied by the total
audited charges to determine the Workers' Compensation
Reimbursement Amount (WCRA) for the admission.


 (v) Audited charges are those charges which remain after a bill review by
the insurance carrier has been performed. Those charges which may
be deducted are personal items (e.g., telephone, television). If an on-site audit is performed, charges for services which are not
documented as rendered during the admission may be deducted. The
formula to obtain audited charges is as follows: Total Charges -
Deducted Charges = Audited Charges.


 (B) Formula. Audited Charges x SLRF = WCRA.


 (C) Example. Total Charges: $108,000; Deducted Charges: $8,001; Audited
Charges: $99,999. $99,999 x 75% = $74,999.25 (WCRA).



Rule 134.401(c)(6). In addition, Rule 134.401 also defines the terms "Stop-Loss Payment," "Stop-Loss Reimbursement Factor," and "Stop-Loss Threshold." Id. § 134.401(b)(1)(F)-(H). Stop-Loss
Payment is "[a]n independent method of payment for an unusually costly or lengthy stay." Id.
§ 134.401(b)(1)(F). Stop-Loss Reimbursement Factor is "[a] factor established by the Commission
to be used as a multiplier to establish a reimbursement amount when the total hospital charges
have exceeded specific stop-loss thresholds." Id. § 134.401(b)(1)(G). Stop-Loss Threshold is "[the]
Threshold of total charges established by the Commission, beyond which reimbursement is
calculated by multiplying the applicable Stop-Loss Reimbursement Factor by the total charges
identifying that particular threshold." Id. § 134.401(b)(1)(H).

 Rule 134.401 also sets forth certain general information as follows: All hospitals
must bill their "usual and customary charges." Id. § 134.401(b)(2)(A). Hospital reimbursement for
acute care hospital inpatient services rendered shall be the lesser of pre-negotiated rates between the
hospital and insurance carrier, the hospital's usual and customary charges, or reimbursement as set
out in subsection (c) of Rule 134.401 for the particular admission. Id. § 134.401(b)(2)(A)(i)-(iii). 
Additional Reimbursements as outlined in subsection (c)(4) will be determined on a case-by-case
basis within the guidelines established for the specific services rendered. Id. § 134.401(b)(2)(B). 
Finally, all hospital charges are subject to audit as described in the Commission's rules. Id.
§ 134.401(b)(2)(C).


Medical Fee Disputes

 In 2001, with health care costs rising, the Division began to see a corresponding rise
in the number of medical fee disputes between hospitals and insurance carriers. Under the labor
code, a health care provider dissatisfied with a carrier's payment can file an administrative dispute
with the Division. See Tex. Lab. Code Ann. § 413.031(a) (West Supp. 2008). A Division employee
known as a medical dispute resolution officer, or MDRO, reviews the complaint and documentation
filed by the provider and the carrier and determines the appropriate reimbursement due the provider
under the labor code and the Division's rules. See id. § 413.031(c); 28 Tex. Admin. Code § 133.307
(2007). If either party is dissatisfied with the MDRO's decision, that party can request a hearing
before an Administrative Law Judge at the State Office of Administrative Hearings (SOAH). See
Tex. Lab. Code Ann. § 413.031(k). (4) Under the labor code, the ALJ issues the final administrative
order. See id. §§ 402.073(b) (West Supp. 2008), 413.031(k). But a party may seek judicial review
of the ALJ's order in a Travis County District Court under the substantial evidence rule. See id.
§ 413.031(k-1).

 Many of these administrative fee disputes concerned the applicability of the Stop-Loss
Exception. The hospitals argued that the Stop-Loss Exception applied whenever the audited
charges for a particular admission exceeded $40,000. The hospitals thus urged that whenever
the audited charges for a particular admission exceeded $40,000, reimbursement should be paid at
75% of the total audited charges using the Stop-Loss Reimbursement Factor in Rule 134.401. See
Rule 134.401(c)(6)(A)(iii). The insurance carriers disagreed and argued that reimbursing a hospital
admission at 75% of the total audited charges anytime those charges exceeded $40,000 would
produce a windfall for the hospitals and defeat the statutory objective of achieving effective
medical cost control. Accordingly, the carriers urged that, in addition to total audited charges
exceeding $40,000, a hospital must prove that an admission involved "unusually costly" and
"unusually extensive" services, before the Stop-Loss Exception applied. Essentially, the carriers
argued that the hospitals must satisfy a two-pronged test before reimbursement under the Stop-Loss
Exception applied.

 When resolving these initial administrative disputes, the Division's MDROs issued
conflicting opinions regarding the applicability of the Stop-Loss Exception. Some MDROs applied
the Stop-Loss Exception whenever total audited charges exceeded $40,000, and some MDROs
applied the Stop-Loss Exception on a case-by-case basis only to those cases involving unusually
costly and unusually extensive services where total audited charges exceeded $40,000. For those
cases appealed to SOAH, the first SOAH decisions issued in 2001 applied the Stop-Loss Exception
on a case-by-case basis only to those cases involving unusually costly and unusually extensive
services in which total audited charges exceeded $40,000. Thereafter, SOAH ALJs issued
conflicting decisions on when to apply the Stop-Loss Exception. Like the Division's MDROs, some
ALJs applied the Stop-Loss Exception whenever total audited charges exceeded $40,000, and other
ALJs applied the Stop-Loss Exception on a case-by-case basis only in those cases involving
unusually costly or unusually extensive services where total audited charges exceeded $40,000.


The 2005 Staff Report & Resulting Appeals

 When Allen McDonald became Director of the Medical Review Division in 2004,
he identified an internal split among Division employees over the proper interpretation and
application of the Stop-Loss Exception. In the fall of 2004, McDonald ordered a halt in the issuance
of MDRO decisions in Stop-Loss Exception disputes until he could investigate further. At the
January 2005 public meeting, the Division's Chairman inquired about the inconsistent agency
positions regarding the Stop-Loss Exception. McDonald promised to report back at the next
meeting. At the February 2005 public meeting, McDonald presented the 2005 Staff Report, a one-page document in which McDonald explained the proper interpretation and application of the Stop-Loss Exception. The 2005 Staff Report explained that in order to qualify for Stop-Loss Payment,
an admission must have audited charges exceeding $40,000 and the admission must involve
unusually costly and unusually extensive services. The agency Commissioners acknowledged
McDonald for his presentation but took no official action regarding the 2005 Staff Report.

 Between February 2005 and June 2006, Division MDROs applied the two-part
interpretation of the Stop-Loss Exception in the 2005 Staff Report in almost 1,500 disputes. Many
of these disputes, including the dispute that led to this case, were appealed directly to the
district court. (5)


The 2007 En Banc Panel Decision

 After the Staff Report was issued in 2005, SOAH began consolidating the Stop-Loss
Exception disputes into one docket for consideration of threshold legal issues. This docket was
assigned to an en banc panel of nine SOAH ALJs in 2006. In January 2007, after briefing on a
limited record, the en banc panel rejected the Division's interpretation and application of the Stop-Loss Exception as explained in the 2005 Staff Report and held, 7-2, that the Stop-Loss Exception
applied in any case in which total audited charges exceeded $40,000. The en banc panel held that
this dollar amount threshold was the only prerequisite for payment under the stop-loss method. In
addition, the en banc panel held that a hospital's implant charges, regardless of mark-up, must
be used when deciding whether the $40,000 threshold has been met. The en banc panel rejected
the carriers' arguments that implant charges should be reduced to cost plus 10% as required in
Rule 134.401 when determining whether audited charges exceeded $40,000.

 Since the issuance of the en banc panel decision, SOAH ALJ's have ordered
numerous reimbursements at 75% of audited charges. Most carriers have paid under protest
and perfected appeals to the district court in these cases. (6)


The Trial Court's Judgment

 The instant appeal originated in 2006 when Vista appealed one of the many decisions
rendered by the Division's MDROs pursuant to the 2005 Staff Report. In addition to the suit for
judicial review allowed under the labor code, Vista sought a declaration under section 2001.038 of
the Administrative Procedure Act, see Tex. Gov't Code Ann. § 2001.038 (West 2000), regarding
the proper interpretation of the Stop-Loss Exception, as well as a declaration that the 2005 Staff
Report was an invalidly adopted rule.

 As one of the defendants in Vista's lawsuit, Texas Mutual filed an answer and
counterclaim against Vista, as well as a cross-claim against the Division challenging the validity of
Rule 134.401 and the Stop-Loss Exception. Texas Mutual sought competing declarations that the
1997 guideline, properly interpreted: (1) required that charges for implants be audited to cost plus
10% before determining whether an admission met the $40,000 minimum stop-loss threshold;
and (2) required a hospital to prove that the services provided in an admission were unusually
costly and unusually extensive before that admission was entitled to Stop-Loss Payment under
Rule 134.401. Alternatively, Texas Mutual sought a declaration that the Stop-Loss Exception was
invalid because it violated statutory standards and was an unconstitutional delegation of the
Division's legislative authority to private parties.

 Several carriers and another hospital intervened and sought declaratory relief
regarding the application and validity of the Stop-Loss Exception. The trial court severed the
parties' claims for declaratory relief from Vista's administrative appeal. After a bench trial, the
trial court entered final judgment with the following declarations:


 1. The Court declares that the stop-loss reimbursement methodology of the
Acute Care Inpatient Hospital Fee Guideline found at 28 Texas
Administrative Code § 134.401(c)(6) requires only that a provider prove that
its total audited charges exceed $40,000 in order for the stop-loss
reimbursement methodology to apply; there is no additional requirement that
a provider prove that the admission was unusually costly, or unusually
extensive[,] in order for the stop-loss reimbursement methodology to apply.


 2. The Court declares that the Staff Report that was admitted into evidence as
Vista Exhibit 9 and Joint Exhibit 4 is an administrative rule as defined in
Tex. Gov't Code § 2001.003(6) and is invalid and voidable because it was
not adopted in substantial compliance with Tex. Gov't Code § 2001.0225
through Tex. Gov't Code § 2001.034.


 3. Instead of remanding the rule to the Division under Tex. Gov't Code
§ 2001.040 to allow a reasonable time for the Division to either revise or
readopt the rule through established procedures, the Court finds good cause
to immediately invalidate the Staff Report because the Court holds that
absent the addition of objective criteria, the phrases "unusually costly" and
"unusually extensive" as used by the Division are so vague and uncertain that
their use in determining whether the stop-loss reimbursement methodology
applies would be arbitrary.


 4. The Court declares that when determining whether payment is due under 28
Tex. Admin. Code 134.401(c)(6), a carrier is authorized to audit all hospital
charges in accordance with applicable Division retrospective rules, and is not
limited to auditing for the deductions as described in 28 Tex. Admin. Code
§ 134.401(c)(6)(A)(v).


 5. The Court declares that under 28 Tex. Admin. Code § 134.401(c)(6), a carrier
is not authorized to reduce the provider's usual and customary charges for
implantables, orthotics and prosthetics to cost plus 10% in determining
whether the stop-loss reimbursement methodology applies for reimbursement
purposes.


The trial court's judgment denied all further relief not specifically granted and ordered that each
party was to bear its own costs, attorney's fees, and other expenses. The trial court denied Texas
Mutual's motion for new trial, and the insurance carriers, including Texas Mutual, Liberty Mutual,
Zenith, and Zurich American, appealed to this Court. The Division did not appeal.


DISCUSSION


 This appeal involves the proper interpretation and application of Rule 134.401. The
carriers urge reversal of the trial court's judgment arguing that the trial court's declarations
erroneously interpret Rule 134.401. The hospitals counter that the trial court's judgment was proper
and this Court should affirm. The Division does not appeal the trial court's judgment but urges this
Court to reject the carriers' challenges to the validity of Rule 134.401. For the reasons discussed
below, we determine the trial court erred in its interpretation of Rule 134.401.


Standard of Review

 We review the trial court's declaratory judgment de novo. See City of San Antonio
v. City of Boerne, 111 S.W.3d 22, 25-26 (Tex. 2003).

 This appeal concerns a challenge to the validity of an administrative rule
under section 2001.038 of the government code. See Tex. Gov't Code Ann. § 2001.038. When
considering a challenge to the validity of an administrative rule, we begin with the presumption that
the rule is valid, and the party challenging the rule has the burden of demonstrating its invalidity. 
See Office of Pub. Util. Counsel v. Public Util. Comm'n, 104 S.W.3d 225, 232 (Tex. App.--Austin
2005, no pet.); McCarty v. Texas Parks & Wildlife Dep't, 919 S.W.2d 853, 854 (Tex. App.--Austin
1996, no writ) (citing cases). We construe administrative rules, which have the same force and effect
as statutes, in the same manner as statutes. Rodriguez v. Service Lloyds Ins. Co., 997 S.W.2d 248,
254 (Tex. 1999); Lewis v. Jacksonville Bldg. & Loan Ass'n, 540 S.W.2d 307, 310 (Tex. 1976). In
construing a Division rule, our primary objective is to give effect to the Division's intent. Rodriguez,
997 S.W.2d at 254. We defer to the Division's interpretation of its own rules so long as that
interpretation is reasonable and consistent with the plain language of the rule. Public Util. Comm'n
v. Gulf States Utils. Co., 809 S.W.2d 201, 207 (Tex. 1991); see also Tex. Gov't Code Ann.
§ 311.023(6) (West 2005). Our review is limited to determining whether the administrative
interpretation is plainly erroneous or inconsistent with the rule. Gulf States Utils., 809 S.W.2d at 207
(citing United States v. Larionoff, 431 U.S. 864, 872 (1977)). However, if an agency fails to follow
the clear, unambiguous language of its own regulation, we must reverse its action as arbitrary and
capricious. Id. (citing Sam Houston Elec. Coop., Inc. v. Public Util. Comm'n, 733 S.W.2d 905, 913
(Tex. App.--Austin 1987, writ denied)).

Carrier Claims

 On appeal, the insurance carriers raise several challenges to the trial court's judgment. 
In general, the carriers argue that the trial court erred in its construction of Rule 134.401 and in its
declaration that Rule 134.401 was a valid rule. (7) The carriers argue that Rule 134.401 is valid if
properly interpreted. The carriers assert that the proper interpretation of Rule 134.401 requires proof
that audited charges exceed $40,000, as well as proof that an admission involved unusually costly
and unusually extensive services, before an admission can be paid under the Stop-Loss Exception. 
The carriers also argue that the trial court erred in its declaration that the terms "unusually costly"
and "unusually extensive" are so vague as to be arbitrary and that the trial court should not have
found the 2005 Staff Report to be an invalid rule. Finally, the carriers argue that the trial court erred
in its declaration that the charges for implantables, orthotics, and prosthetics could not be audited
to cost plus 10% when determining whether audited charges exceed $40,000.

 Alternatively, the carriers assert that Rule 134.401 as interpreted by the trial court
is invalid because it fails to satisfy the statutory requirements of labor code section 413.011. In
particular, the carriers argue that Rule 134.401 as interpreted by the trial court violates labor code
section 413.011 because:



 it does not result in fair and reasonable reimbursement;

 it is not based on Medicare reimbursement policies and methodologies;

 it has not been reviewed and revised every two years;
 it no longer achieves effective medical cost control;

 it constitutes an unconstitutional private delegation of agency authority;

 it allows for reimbursement for medical services in excess of those amounts
charged for similar treatment to individuals with an equivalent standard of
living; and

 it is inconsistent with the labor code definition of "medical benefit."




 1. Interpretation of the Stop-Loss Exception

 We begin our analysis of the carriers' claims with a review of the trial court's
interpretation of Rule 134.401. The carriers challenge the trial court's interpretation of the Stop-Loss
Exception, or section 134.401(c)(6) of the rule. The plain language of the rule provides that the stop-loss method is an independent reimbursement methodology established to ensure fair and reasonable
compensation to the hospital for unusually costly services rendered during treatment to an injured
worker. See Rule 134.401(c)(6). The rule also provides that the stop-loss threshold was established
to ensure compensation for unusually extensive services during a hospital admission and that
an admission is eligible for stop-loss payment if the total audited charges exceed $40,000. Id.
§ 134.401(c)(6)(i)-(ii).

 We construe administrative rules, which have the same force as statutes, in the same
manner as statutes. Rodriguez, 997 S.W.2d at 254. As when construing a statute, we must read
the rule as a whole, giving meaning and purpose to every part. See Sharp v. House of Lloyd, Inc.,
815 S.W.2d 245, 249 (Tex. 1991); Ex Parte Pruitt, 551 S.W.2d 706, 709 (Tex. 1977). We should
not construe a rule in a way that would lead to an absurd or unreasonable result if another more
reasonable construction or interpretation exists. See National Plan Adm'rs, Inc. v. National Health
Ins. Co., 235 S.W.3d 695, 701 (Tex. 2007); C&H Nationwide v. Thompson, 903 S.W.2d 315, 322
n.5 (Tex. 1994). We give effect to all words in the rule and, if possible, do not treat any words
as mere surplusage. See Spradlin v. Jim Walter Homes, Inc., 34 S.W.3d 578, 580 (Tex. 2000). 
Accordingly, we avoid construing rules in a way that would render portions of the rule inoperable
or meaningless. See id.

 The trial court's declaration that a hospital need only demonstrate that total audited
charges exceed $40,000 to be entitled to payment under the Stop-Loss Exception is contrary to
the plain language of the rule. The rule states that the Stop-Loss Exception was established to
ensure compensation for unusually costly and unusually extensive services during a hospital
admission. See Rule 134.401(c)(6). The rule also states that the stop-loss threshold was established
to ensure compensation for unusually extensive services during a hospital admission. Id.
§ 134.401(c)(6)(A)(ii). The trial court's declaration eliminates the Division's ability under the rule
to ensure that the Stop-Loss Exception provides compensation for unusually costly and unusually
extensive services.

 The trial court's declaration is inconsistent with other provisions in the rule. For
example, the rule defines "Stop-Loss Payment" as an independent method of payment for an
unusually costly or lengthy stay. Id. § 134.401(b)(1)(F). But the trial court's declaration precludes
consideration of whether a hospital admission was unusually costly or lengthy. In addition, the
rule states that $40,000 is the "minimum stop-loss threshold." Id. § 134.401(c)(6)(A)(i) (emphasis
added). By its terms, this language suggests that there must be something more than a dollar amount
to be considered when determining whether to apply the Stop-Loss Exception. The basic structure
of the rule is consistent with this concept: The rule provides that reimbursement will be made under
the standard per diem method unless an exception applies. Id. § 134.401(c)(2). The rule further
states that independent reimbursement under the Stop-Loss Exception will be "allowed on a case-by-case basis." Id. § 134.401(c)(2)(C). This language suggests that the Stop-Loss Exception was meant
to apply on a case-by-case basis in relatively few cases. Without consideration of whether an
admission involves unusually costly or unusually extensive services, there can be no determination
on a case-by-case basis, and the Stop-Loss Exception would mechanically apply in all cases where
total audited charges exceeded $40,000. Reading the language of the rule as a whole, this cannot be
what the Division intended.

 The trial court's declaration is also contrary to the legislative mandate in the labor
code because it precludes the Division from achieving effective medical cost control. Under the
trial court's interpretation, the Division cannot limit the application of the Stop-Loss Exception to
those cases involving unusually costly and unusually extensive services in which total audited
charges exceed $40,000. When the Division adopted the 1997 guideline, it provided for a standard
per diem reimbursement methodology with two exceptions. With the rise in health care costs as
demonstrated by the record evidence in this case, the trial court's interpretation leads to the absurd
and unreasonable result that reimbursement under the Stop-Loss Exception has replaced the standard
per diem method as the general method of hospital reimbursement. Stated differently, the exception
has now become the rule. We do not believe that this is what the Division intended when it adopted
the 1997 guideline.


 For these reasons, we conclude that the trial court's interpretation is contrary
to the plain language of the rule, renders portions of the rule meaningless, and leads to results
inconsistent with the intent of the statutory structure. A more reasonable interpretation of the rule
is that to be eligible for reimbursement under the Stop-Loss Exception, a hospital must demonstrate
that total audited charges exceed $40,000 and that an admission involved unusually costly and
unusually extensive services. This interpretation is consistent with the plain language of the rule,
which states that the stop-loss method was established to ensure fair and reasonable compensation
to the hospital for unusually costly and unusually extensive services. Id. § 134.401(c)(6),
(c)(6)(A)(ii). It is likewise consistent with the interpretation urged by the Division in the 2005 Staff
Report, which we address more fully below. And it is consistent with the basic structure of the rule,
which calls for reimbursement under the standard per diem method except as allowed on a case-by-case basis under the Stop-Loss Exception. Accordingly, we sustain the carriers' challenge, reverse
the trial court's declaration, and render judgment that the Stop-Loss Exception requires a hospital
to demonstrate that total audited charges exceed $40,000 and that the admission involved unusually
costly and unusually extensive services to receive reimbursement under the stop-loss method.

 We emphasize that, in light of the legislative mandate in section 413.011 of the labor
code requiring the Division to adopt fee guidelines designed to achieve both quality medical care
and effective medical cost control, this is a more reasonable interpretation of the Stop-Loss
Exception in Rule 134.401. Furthermore, because we adopt the construction of the rule urged by
the carriers on appeal, we need not reach the carriers' alternative claims that the rule, as construed
by the trial court, is an invalid delegation of the Division's legislative authority. Nor do we reach
the carriers' claims that the rule, as interpreted by the trial court, is invalid because it fails to provide
fair and reasonable reimbursement, fails to achieve effective medical cost control, or allows for
reimbursement for medical services in excess of those amounts charged for similar treatment to
individuals with an equivalent standard of living as required in section 413.011 of the labor code,
or that the trial court's interpretation is inconsistent with the definition of "medical benefit" in labor
code section 401.011(31).

 To the extent certain carriers maintain that Rule 134.401 was invalid at its inception,
or became invalid at some later date, because the rule is not based on Medicare reimbursement
policies and methodologies and has not been reviewed and revised every two years, we find those
claims to be without merit. While we agree with the carriers that section 413.011 of the labor code
currently requires the Division to adopt medical fee guidelines that follow Medicare reimbursement
policies and methodologies, see Tex. Lab. Code Ann. § 413.011(a), this requirement was not part
of the statute when the Division adopted Rule 134.401 in 1997 and was not added until 2001. See
Act of May 25, 2001, 77th Leg., R.S., ch. 1456, § 6.02, 2001 Tex. Gen. Laws 5167, 5185 (amending
section 413.011(a) to require the Division to "adopt the most current reimbursement methodologies
. . . used by the federal Health Care Financing Administration"). (8) Because this requirement was
not part of the statute in 1997, the rule was not invalid at its inception for failing to meet this
requirement. Nor do we believe that the rule became invalid at the moment this requirement was
added to the statute in 2001. (9)

 Similarly, we agree that section 413.012 states that the medical fee guidelines "shall
be reviewed and revised" every two years to reflect fair and reasonable rates and to reflect reasonable
and necessary ranges of medical treatment. See Tex. Lab. Code Ann. § 413.012 (West 2006). But
it does not follow that the Division's failure to review and revise the 1997 guideline every two years
since it was adopted invalidates the rule.

 Although we generally construe the term "shall" as imposing a duty or obligation, see
Tex. Gov't Code Ann. § 311.016 (West 2005), Texas courts have, in certain circumstances,
construed "shall" to be directory. See, e.g., Albertson's Inc. v. Sinclair, 984 S.W.2d 958, 961
(Tex. 1999). To determine whether the legislature intended a provision to be mandatory or directory,
we consider the plain meaning of the words used, as well as the entire act, its nature and object, and
the consequences that would follow from each construction. See Schepps v. Presbyterian Hosp. of
Dallas, 652 S.W.2d 934, 936 (Tex. 1983) (citing Chisholm v. Bewley Mills, 287 S.W.2d 943, 945
(Tex. 1956)). The supreme court has held that "provisions which are not of the essence of the thing
to be done," but are directed instead towards the prompt and orderly conduct of business, are not
generally considered mandatory. Id. When a statute is silent about consequences of noncompliance,
we look to the statute's purpose in determining the proper consequence of noncompliance. Id. at
938. "If a provision requires that an act be performed within a certain time without any words
restraining the act's performance after that time, the timing provision is usually directory." Helena
Chem. Co. v. Wilkins, 47 S.W.3d 486, 495 (Tex. 2001). Further, we liberally construe workers'
compensation legislation to carry out its evident purpose of compensating injured workers and their
dependents. See Lujan v. Houston Gen. Ins. Co., 756 S.W.2d 295, 297 (Tex. 1988); Ward v. Charter
Oak Fire Ins. Co., 579 S.W.2d 909, 910 (Tex. 1979).

 The legislature has provided no consequences for the Division's unfortunate
noncompliance with the statutory directives in section 413.011 or 413.012 of the labor code. If the
legislature had intended consequences for the failure to adopt Medicare reimbursement
methodologies or the failure to review and revise the fee guidelines, it could have spelled out those
consequences in the statute. With regard to the legislature's requirement that the Division adopt new
treatment guidelines for injured workers, the legislature expressly provided that "[t]he treatment
guidelines adopted under Chapter 413, in effect immediately before September 1, 2001,
are abolished on January 1, 2002." See Act of May 25, 2001, 77th Leg., R.S., ch. 1456, § 6.09(b),
2001 Tex. Gen. Laws 5167, 5188. It speaks volumes that the legislature provided no consequences
for the failure to adopt Medicare reimbursement methodologies or the failure to review and revise
the fee guidelines every two years.

 The carriers do not complain that the reimbursement rates under the 1997 guideline,
as properly interpreted, are unreasonable. Nor have the carriers demonstrated harm from
the application of the reimbursement rates in the 1997 guideline. Fee guidelines are just
that--guidelines. They "merely assist carriers and, upon review, the [Division] in determining
whether medical charges are 'fair and reasonable' or satisfy the applicable standard." Methodist
Hosp. v. Texas Workers' Comp. Comm'n, 874 S.W.2d 144, 149-50 (Tex. App.--Austin 1994,
writ dism'd w.o.j.). This Court has previously held that there is no private right to a fee guideline
established by rule. See Texas Workers' Comp. Comm'n v. East Side Surgical Ctr., 142 S.W.3d 541,
549 (Tex. App.--Austin 2004, no pet.) ("East Side is only entitled to 'fair and reasonable'
reimbursement--not to have the fee guidelines established by rule."). Accordingly, there can be no
private right to an updated fee guideline or a guideline that uses a particular reimbursement
methodology, so long as the reimbursement provided in the guideline is fair and reasonable. See id.

 For these reasons, we conclude that the labor code's requirement to adopt fee
guidelines that follow Medicare reimbursement methodologies and to review and revise these
guidelines every two years are directory, not mandatory. (10) We further conclude that the Division's
failure to comply with these statutory directives does not invalidate the 1997 guideline, or
Rule 134.401.


 2. "Unusually Costly" and "Unusually Extensive"

 Within their challenge to the trial court's interpretation of Rule 134.401, the carriers
argue that the trial court erred in its determination that the terms "unusually costly" and "unusually
extensive" are "so vague and uncertain that their use in determining whether the [Stop-Loss
Exception] applies would be arbitrary." The carriers assert that such industry terms are knowable,
calculable, and determinable and provide reasonably clear guidance to those parties affected by the
rule. (11) We agree.

 This Court has previously held that where an "idea embodied in a phrase is reasonably
clear, a court should find it acceptable as a standard of measurement." Texas Bldg. Owners
& Managers Ass'n v. Public Util. Comm'n, 110 S.W.3d 524, 535 (Tex. App.--Austin 2003,
pet. denied). The supreme court has also recognized that a broad standard encompassing a multitude
of factors will pass constitutional scrutiny if it is no more extensive than the public interest demands. 
See Jordan v. State Bd. of Ins., 334 S.W.2d 278, 280 (Tex. 1960); Housing Auth. v. Higginbotham,
143 S.W.2d 79, 87 (Tex. 1940). Examples of standards upheld by Texas courts include "not worthy
of public confidence," "unjust, fair, inequitable, misleading, deceptive," and "just and reasonable." 
See Texas Bldg. Owners & Managers Ass'n, 110 S.W.3d at 535 (citing cases).

 We have held that Rule 134.401 requires a provider to demonstrate that the services
it has provided are "unusually costly" and "unusually extensive" in order to be reimbursed under
the stop-loss methodology. The phrases "unusually costly" and "unusually extensive" are no more
vague or uncertain than other standards previously upheld by Texas courts. See id. (discussing
standards and citing cases). They are no more vague or uncertain than other standards in the labor
code requiring fee guidelines to be "fair and reasonable," "ensure quality medical care," and "achieve
effective medical cost control." See Tex. Lab. Code Ann. § 413.011(d). What is unusually costly
and unusually extensive in any particular fee dispute remains a fact-intensive inquiry best left to
the Division's determination on a case-by-case basis. See Texas Bldg. Owners & Managers Ass'n,
110 S.W.3d at 536 (holding that what is "reasonable" and "nondiscriminatory" is fact-intensive
inquiry best left to discretion of Public Utility Commission).

 No party disputes that the labor code delegates authority to the Division to establish
medical fee guidelines, resolve medical fee disputes, and "adjudicate the payment given the relevant
statutory provisions and commissioner rules." Id. §§ 413.011(d) (establish fee guidelines), .031(c)
(adjudicate payment due). The scope of this authority includes the discretion to establish appropriate
standards for reimbursement and to determine whether those standards have been met. Id.
§§ 413.011(d), .031(c); see also Texas Bldg. Owners & Managers Ass'n, 110 S.W.3d at 535-36
(commission's authority to require payment of "reasonable" and "nondiscriminatory" compensation
includes power to determine what is reasonable and nondiscriminatory when dispute arises). To the
extent the parties are dissatisfied with the Division's determination, the labor code provides for
review by SOAH and appeal to the courts. See Tex. Lab. Code Ann. § 413.031(k). (12)

 There is no constitutional requirement that a statute or rule must define all of the
terms used. See Rooms with a View, Inc. v. Private Nat'l Mortgage Ass'n, Inc., 7 S.W.3d 840, 845
(Tex. App.--Austin 1999, pet. denied); Garay v. State, 940 S.W.2d 211, 219 (Tex. App.--Houston
[1st Dist.] 1997, pet. ref'd). Recognizing the myriad of factual situations that may arise and allowing
administrative agencies sufficient flexibility when drafting their rules, courts require no more than a
reasonable degree of certainty defining what is required or prohibited. See Pennington v. Singleton,
606 S.W.2d 682, 689 (Tex. 1980). Courts will invalidate an economic regulation "only if it
commands compliance in terms so vague and indefinite as really to be no rule or standard at all . . .
or if it is substantially incomprehensible." Ford Motor Co. v. Texas Dep't of Transp., 264 F.3d 493,
507 (5th Cir. 2001) (internal quotation omitted); see also Hoffman Estates v. Flipside, Hoffman
Estates, Inc., 455 U.S. 489, 498 (1982) ("Economic regulation is subject to a less strict vagueness
test."). Applying these principles to Rule 134.401, we conclude that the phrases "unusually costly"
and "unusually extensive" are sufficiently definite to provide guidance to the MDROs and ALJs who
review and determine medical fee disputes on a case-by-case basis. See Hoffman Estates, 455 U.S.
at 498; Commission for Lawyer Discipline v. Benton, 980 S.W.2d 425, 437 (Tex. 1998). Therefore,
we sustain the carriers' challenge and reverse the trial court's declaration to the contrary.


 3. 2005 Staff Report

 The carriers also challenge the trial court's determination that the 2005 Staff Report
was an invalid and voidable rule. In its second declaration, the trial court held that the 2005 Staff
Report was an administrative rule as defined in section 2001.003(6) of the government code, and
that it was invalid and voidable because it was not adopted in compliance with government code
sections 2001.0225 through 2001.034. See Tex. Gov't Code Ann. §§ 2001.003, .0225-.034
(West 2000) (defining "rule" and establishing rulemaking procedures). In its third declaration, the
trial court invalidated the 2005 Staff Report because it found that the Division's use of the phrases
"unusually costly" and "unusually extensive" in determining whether the Stop-Loss Exception
applies would be arbitrary. The carriers urge this Court to reverse the trial court's declarations.

 We agree with the carriers that the 2005 Staff Report is not an invalid and voidable
rule. The APA defines a rule as "a state agency statement of general applicability that . . .
implements, interprets, or prescribes law or policy; or . . . describes the procedure or practice
requirements of a state agency." Tex. Gov't Code Ann. § 2001.003(6)(A). The APA definition of
a rule includes "the amendment or repeal of a prior rule," but it does not include "a statement
regarding only the internal management or organization of a state agency and not affecting private
rights or procedures." Id. § 2001.003(6)(B)-(C).

 As a preliminary matter, we conclude that the 2005 Staff Report was not a statement
by a state agency. The 2005 Staff Report was a one-page document prepared by the director of
the Medical Review Division within the Division that was intended to address an internal agency
matter--namely, the inconsistent application of Rule 134.401. The 2005 Staff Report was presented
to the Division at the January 2005 open meeting, but the Division simply thanked the director for
the report and took no official action. The 2005 Staff Report recognized that the Division's MDROs
had a history of inconsistently applying Rule 134.401, and proposed a correction to that internal
inconsistency based on the language of Rule 134.401. For this reason, we conclude that the 2005
Staff Report was not a statement of the agency within the meaning of the APA.

 Even if we recognized the 2005 Staff Report as an agency statement, it is well-established that not every administrative pronouncement is a rule within the meaning of the APA. 
See Texas Educ. Agency v. Leeper, 893 S.W.2d 432, 443 (Tex. 1994); Brinkley v. Texas Lottery
Comm'n, 986 S.W.2d 764, 769 (Tex. App.--Austin 1999, no pet.). "This observation refers to the
fact that administrative agencies routinely issue letters, guidelines, and reports, and occasionally file
briefs in court proceedings, any of which might contain statements that intrinsically implement,
interpret, or prescribe law, policy, or procedure or practice requirements." Brinkley, 986 S.W.2d at
769. If such statements were rules, an agency could not carry out its legislative functions: "How,
under such a theory, could an agency practically express its views to an informal conference or
advisory committee, or state its reasons for denying a petition to adopt a rule or file a brief in a court
or agency proceeding?" Id.

 The supreme court in El Paso Hospital District v. Texas Health and Human Services
Commission, 247 S.W.3d 709 (Tex. 2008), analyzed whether an agency's interpretation of its own
rule was also a rule. (13) In that case, the HHSC had interpreted its rule to impose a February 28th
cutoff date when calculating Medicaid reimbursement rates. Under the rule's definition of "base
year," the HHSC was required to use "'[a] 12-consecutive-month period of claims data,' to calculate
the [h]ospitals' rates." See id. at 714 (quoting 1 Tex. Admin. Code § 355.8063(b)(5)). The supreme
court concluded that the February 28th cutoff was contrary to the rule's definition of base year
because it excluded several claims from the calculation of the hospitals' rates and thus amended the
plain language of the rule. Id. Because the HHSC had not followed APA rulemaking procedures
to promulgate the February 28th cutoff, the supreme court also held that it was invalid and enjoined
the HHSC from using the February 28th cutoff to calculate the hospitals' reimbursement rates. Id.
at 715 (citing Tex. Gov't Code Ann. § 2001.035 (West 2000)).

 Unlike the HHSC's interpretation in El Paso Hospital District, the 2005 Staff
Report does not contradict Rule 134.401. Moreover, assuming the 2005 Staff Report is an agency
statement, it is a statement regarding the agency's internal management that does not affect private
rights. See Tex. Gov't Code Ann. § 2001.003(6)(C). The 2005 Staff Report is a statement regarding
internal management because it is designed to correct MDROs' inconsistent application of the Stop-Loss Exception. It also allowed the agency to function effectively and produced clarity of direction
in a highly technical area. The 2005 Staff Report did not affect private rights because it did not
change or amend Rule 134.401; it simply mandated internal consistency when applying the rule.

 We also reject the hospitals' argument that the 2005 Staff Report was a "new"
interpretation of Rule 134.401. The record before us demonstrates that MDROs in the Division, as
well as SOAH ALJs, had issued conflicting opinions interpreting and applying the Stop-Loss
Exception in Rule 134.401 before the 2005 Staff Report was issued. Some MDROs and ALJs
interpreted and applied the Stop-Loss Exception in the same manner as the 2005 Staff Report, and
some did not. Because there were prior opinions and decisions interpreting and applying the Stop-Loss Exception in the same manner as the 2005 Staff Report, that report cannot, by definition, be
a "new" interpretation of Rule 134.401.

 For these reasons, we conclude that the 2005 Staff Report was not a rule within the
meaning of the APA and, therefore, was not subject to APA rulemaking procedures. We sustain the
carriers' challenge and reverse the trial court's declaration that the 2005 Staff Report was an
invalidly adopted rule.


 4. Reimbursement for Implantables, Orthotics, and Prosthetics

 The carriers also challenge the trial court's declaration that Rule 134.401 does not
allow a carrier to audit a provider's charges for implantables, orthotics, and prosthetics to cost plus
10% when determining whether the $40,000 stop-loss threshold has been met. For the following
reasons we overrule the carriers' challenge and sustain the trial court's judgment.

 Rule 134.401 specifically carves out reimbursement for implantables, orthotics, and
prosthetics. See Rule 134.401(b)(2)(B) (general information regarding additional reimbursements),
(c)(4) ("Additional Reimbursements"). When medically necessary, implantables, orthotics, and
prosthetics are reimbursed as "Additional Reimbursements" under the rule. (14) Id. § 134.401(c)(4)(A). 
As provided in the rule, implantables, orthotics, and prosthetics shall be reimbursed at the cost to
the hospital plus 10%. Id. Rule 134.401 also provides that "[a]ll charges are subject to audit as
described in the Commission rules." Id. § 134.401(b)(2)(C). Rule 134.401 provides that when
audited charges exceed the $40,000 stop-loss threshold, the entire admission shall be reimbursed
using the 75% stop-loss reimbursement factor. Id. § 134.401(c)(6)(A)(iii).

 Reading these provisions together, we conclude that the charges for implantables,
orthotics, and prosthetics must be audited before those charges can be used to determine whether
the $40,000 stop-loss threshold has been met. The question then becomes audited to what? The
carriers argue that these costs should be reduced, or audited, to cost plus 10% as specified in
section 134.401(c)(4)(A). We do not believe this is what the Commission intended. Consider the
following example: if the cost for implantables in a given admission was $40,000, under the
carriers' interpretation, this cost would be audited to cost plus 10%, or $44,000, for purposes of
determining whether the Stop-Loss Exception applied. Assuming that the admission involved
unusually costly and unusually extensive services and because $44,000 is greater than $40,000, the
Stop-Loss Exception would apply. Therefore, the entire admission would be reimbursed using the
following formula:


 Audited Charges x 75% SLRF (15) = WCRA (16)


See Rule 134.401(c)(6)(B). Applying this formula to the example, the hospital would be reimbursed
only $33,000, or $7,000 less than its cost, for the implantables. Under this example, the hospital,
or other provider, would incur a loss.

 Because providers would incur losses under the carriers' proposed construction of
the rule, that interpretation would be contrary to the statutory requirement that fee guidelines be "fair
and reasonable." See Tex. Lab. Code Ann. § 413.011(d). We cannot construe the rule in a manner
that is inconsistent with the statute. See, e.g., Centerpoint Energy, Inc. v. Public Util. Comm'n,
143 S.W.3d 81, 85 (Tex. 2004) (observing that rule is invalid if it violates statutory provision); Texas
Workers' Comp. Comm'n v. Patient Advocates, 136 S.W.3d 643, 657-58 (Tex. 2004) (upholding
rule as consistent with statute); National Plan Adm'rs, Inc., 235 S.W.3d at 701 (courts should
not construe statute in manner that leads to absurd results); C&H Nationwide, 903 S.W.2d at 322
n.5 (same).

 For these reasons, we conclude there was no error in the trial court's declaration
that the costs for implantables, orthotics, and prosthetics should not be reduced to cost plus 10%
when determining whether the $40,000 stop-loss threshold has been met. This is consistent with the
plain language of the rule and section 413.011 of the labor code. It is likewise consistent with the
trial court's judgment that a carrier is authorized to audit all hospital charges in accordance with
applicable Division retrospective review rules, which we affirm because no party has challenged
that declaration on appeal.


CONCLUSION


 Having considered all of the parties' issues, we affirm the trial court's judgment that
carriers may audit a provider's charges as permitted by the Division's rules and that a carrier may
not reduce the charges for implantables, orthotics, and prosthetics to cost plus 10% when
determining whether the Stop-Loss Exception applies. We reverse the trial court's judgment that
the Stop-Loss Exception applies to any admission in which audited charges exceed $40,000, and we
render judgment that, to establish eligibility for reimbursement under the Stop-Loss methodology,
a provider must demonstrate that audited charges exceed $40,000 and that the services provided were
unusually costly and unusually extensive so as to allow application of the exception. We also reverse
the trial court's judgment that the 2005 Staff Report is an invalid rule and that the phrases "unusually
costly" and "unusually extensive" are so vague and uncertain that their use by the Division in
determining whether the Stop-Loss Exception applies would be arbitrary.





 __________________________________________

 Jan P. Patterson, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed in part; Reversed and Rendered in part

Filed: November 13, 2008
1. The rule at issue was originally promulgated by the Texas Workers' Compensation
Commission in 1997, but the legislature abolished the TWCC in 2005 and transferred its duties
and rules to the Division of Workers' Compensation within the Texas Department of Insurance. See
Act of May 29, 2005, 79th Leg., R.S., ch. 265, §§ 8.001(b), .004(a), 2005 Tex. Gen. Laws 468, 607-11. In light of this change, we refer to the agency throughout this opinion as either the
"Commission" or the "Division."
2. Rule 134.401 was adopted in 1997, see 22 Tex. Reg. 6264 (July 4, 1997), and formerly
codified at 28 Tex. Admin. Code § 134.401 (2007), but has since been repealed. See 33 Tex. Reg.
5319 (July 4, 2008) (repealing Rule 134.401). Because the 1997 rule remains in effect
for admissions occurring prior to its repeal effective March 1, 2008, we refer to the rule as
"Rule 134.401" or the "1997 guideline."
3. The Workers' Compensation Act was initially located in articles 8303-1.01 through 8308-11.10 of the Texas Revised Civil Statutes, but was codified in the labor code in 1993. See Act of
May 12, 1993, 73rd Leg., R.S., ch. 269, 2003 Tex. Gen. Laws 987.
4. There was a window of time between 2005 and 2007 when a party was not entitled to
request a hearing at SOAH. In 2005, the Legislature amended section 413.031(k) to eliminate
the option of requesting a hearing at SOAH in a medical fee dispute. See Act of May 29, 2005,
79th Leg., R.S., ch. 265, § 3.245, 2005 Tex. Gen. Laws 469, 554 (amending section 413.031(k) of
the labor code). But, in 2007, the Legislature re-wrote section 413.031(k) again and restored the
option of requesting a SOAH hearing before seeking judicial review in a medical fee dispute. See
Act of May 23, 2007, 80th Leg., R.S., ch. 1007, § 1, 2007 Tex. Gen. Laws 3525, 3525 (codified at
Tex. Lab. Code Ann. § 413.031(k) (West Supp. 2008)).
5. These appeals were taken during the window of time when parties were not entitled to a
hearing at SOAH. See note 4 supra. The parties have informed the Court that these appeals are
inactive pending resolution of this appeal.
6. The parties agree that these appeals are likewise inactive pending resolution of this appeal.
7. Certain carriers argue that Rule 134.401 has been invalid since its inception or that it has
become invalid for the various reasons we discuss.
8. This language was changed in 2005 from "Health Care Financing Administration" to
"Centers for Medicare and Medicaid Services." Act of May 29, 2005, 79th Leg., R.S., ch. 265,
§ 3.233, 2005 Tex. Gen. Laws 469, 548.
9. "The measure of the validity of an agency rule is whether it is constitutional and whether
it conforms to the procedural and substantive statutes applicable to its adoption." Texas Dep't of
Banking v. Restland Funeral Home, Inc., 847 S.W.2d 680, 683 (Tex. App.--Austin 1993, no writ).
10. We reject the carriers' argument that this Court's opinion in Texas Medical Association
v. Texas Workers' Compensation Commission, 137 S.W.3d 342 (Tex. App.--Austin 2004, no pet.),
requires a different result. In Texas Medical Association, this Court stated that "the Commission has
the ongoing statutory duty to review and revise the fee guidelines to ensure they are in compliance
with the statutory factors," see id. at 350 (citing Tex. Lab. Code Ann. § 413.012 (West 2006)), but
this Court did not consider whether that "ongoing duty" was mandatory or directory. See id. Nor
did this Court consider the appropriate consequence for noncompliance with this "ongoing duty." 
Thus, our opinion in Texas Medical Association does not answer the question before us
today--namely, whether this Court may invalidate an agency rule for noncompliance with a statutory
directive when the legislature is silent.
11. The record demonstrates that MDROs, carriers, and hospitals understand and are familiar
with these terms because they have been previously utilized and applied in other cases since the 1997
guideline was promulgated.
12. See also note 4 supra (explaining that between 2005 and 2007 the legislature provided for
direct appeal to the courts without allowing an administrative hearing at SOAH).
13. It is undisputed that the Division has authority to interpret its own rules.
14. Also included in the category of "Additional Reimbursements" are magnetic resonance
imaging (MRIs), computerized axial tomography (CAT scans), hyperbaric oxygen, blood,
air ambulance, and pharmaceuticals. Rule 134.401(c)(4)(B)-(C).
15. SLRF means "Stop-Loss Reimbursement Factor." See Rule 134.401(c)(6)(A).
16. WCRA means "Workers' Compensation Reimbursement Amount." See id.